774 P.2d 299

The STATE of Idaho,
Plaintiff–Respondent,

v.

Jaimi Dean CHARBONEAU,
Defendant–Appellant.

Nos. 16339, 16741.

Supreme Court of Idaho.

April 4, 1989.

Rehearing Denied May 25, 1989.

Greg J. Fuller, Jerome, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., argued, Boise, for respondent.

JOHNSON, Justice.

This is a first degree murder case that comes to us for review of a death sentence pursuant to I.C. § 19–2827 and on appeal from the conviction and from denial of applications for post-conviction relief. We affirm the conviction but vacate the sentence and remand the case to the trial court for resentencing.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

Jaimi Dean Charboneau (Jaimi) was convicted of the first degree murder of his former wife, Marilyn Arbaugh (Marilyn). Jaimi was sentenced to death for this crime. The trial court twice denied post-conviction relief.

Jaimi and Marilyn lived together for approximately two years before they were married in June 1983. Marilyn had two teenage daughters, Tiffnie and Tira. The relationship between Jaimi and Marilyn was stormy. There is evidence that Jaimi physically abused Marilyn. In August 1983 Marilyn shot Jaimi with a .22 caliber pistol during a dispute. An aggravated battery charge was filed against Marilyn but was subsequently dismissed on the motion of the prosecuting attorney. In the spring of 1984 Marilyn filed for divorce. A

default judgment was granted on June 13, 1984. There is evidence that Jaimi and Marilyn continued to see each other and were sometimes intimate after the divorce.

On June 21, 1984, Jaimi went to the cafe where Marilyn worked. They left in Marilyn's car. There is some dispute whether Marilyn went with Jaimi voluntarily. The next day Marilyn reported to the police that Jaimi had kidnapped and raped her and had stolen her car. There is evidence that Jaimi travelled to Nevada after June 21. The burned remains of Marilyn's car were found in southern Idaho in late June 1984. On June 25, 1984, Jaimi was charged in Jerome County, Idaho with first degree kidnapping of Marilyn and grand theft of her car.

On June 28, 1984, Jaimi purchased a .22 caliber rifle from a hardware store in Gooding, Idaho. About mid-morning on Sunday, July 1, 1984, Marilyn returned to her residence on a ranch near Jerome, after being gone since the evening before. Some time after 11:00 o'clock that morning Marilyn went out to check some horses in a corral near her home. Shortly after that Marilyn's daughter Tiffnie heard shots outside, grabbed Marilyn's .22 pistol, and went to see what had happened. She found her mother sitting on the ground in the barn with blood on her. Jaimi was standing close to Marilyn with a .22 caliber rifle pointed at Marilyn. Tiffnie asked Jaimi to leave and told him she was going to call the police. Jaimi told Tiffnie that he would take Marilyn to the doctor. Both Marilyn and Jaimi told Tiffnie to leave.

At 11:38 that morning Tiffnie called the Jerome County Sheriff's office and said that Jaimi had shot her mother. Tiffnie then told her sister Tira about the shooting, and they both got dressed. They heard more shots and ran outside where they hid behind a sheep wagon and called to their mother. Tiffnie had her mother's .22 caliber pistol with her, and it accidentally discharged behind her. She ran into the house, hid the gun, returned to the sheep wagon, and then ran to the barn. Tira followed close behind. Marilyn was lying on her back with her arms over her head.

The girls ran back to call for an ambulance. At 11:42 a.m. Tira telephoned for assistance and reached the Jerome County Sheriff's office. She told them to get an ambulance and that her mother was dying. When the sheriff's deputies arrived at the scene, they found Marilyn's body in the barn and located Jaimi in a field near the barn with a .22 caliber rifle lying nearby. Jaimi was arrested and charged with first degree murder. At the time of his arrest, Jaimi acknowledged that he had shot Marilyn, although he stated that he did so because she was going to shoot him.

The Jerome County public defender (the public defender) was appointed to represent Jaimi on the murder, kidnapping, and grand theft charges. Prior to a preliminary hearing on these charges, Jaimi's mother employed a private defense attorney (the defense attorney) to represent him. Following the preliminary hearing, Jaimi was bound over for trial on all three charges.

Jaimi told the defense attorney that he had not kidnapped or raped Marilyn and that he had not stolen her car. He stated that he and Marilyn had maintained a close and intimate relationship after their divorce, that she had been with him voluntarily on June 21 and 22, 1984, and that they had had consensual sexual intercourse on that occasion. He said that he had purchased the .22 caliber rifle as a present for Tira and on June 28, 1984, had taken it with him to the ranch where Marilyn and her daughters lived. He told the defense attorney that he and Marilyn had reconciled and were going to live together again, but that she wanted him to stay in the barn until she broke the news to her daughters. He said that he and Marilyn had sexual relations on the evening of June 30, 1984, and that she then left the ranch and did not return until the next morning.

Initially, Jaimi told the defense attorney that on the morning of July 1, 1984, Marilyn had taken the .22 caliber rifle he had purchased for Tira into the house to remove a scope sight from it. He said that when she returned to the barn she loaded the rifle, pointed it at Jaimi, and pulled the

trigger, but that it did not fire. Jaimi told the defense attorney that he grabbed the rifle from Marilyn and pulled the trigger several times while the rifle was on his hip and Marilyn was running away. He said that he closed his eyes while shooting. He said that after the shooting he took the rifle and fled to the nearby field.

Later, but prior to August 22, 1984, Jaimi told the defense attorney that after he fired the shots at Marilyn, instead of running directly out into the field, he had stayed around the end of the barn. He told the defense attorney that he heard Tiffnie talking to her mother and had looked around the corner. He said he saw Tiffnie holding a pistol in both hands pointed at Marilyn. Jaimi said that Tiffnie told Marilyn that Marilyn had screwed up their lives, ruined Tira's life, and was ruining Jaimi. He stated that he saw Tiffnie fire a shot from the pistol and saw Marilyn's hair fly up.

The defense attorney contends that based on this second version of the events of July 1, 1984, he tried to convince the prosecuting attorney to reinvestigate the crime. On August 23, 1984, he also discussed this version in a telephone conversation with his niece who was a psychic. Shortly after August 23, 1984, the defense attorney received a letter from his niece in which she reported having made contact with Marilyn through clairvoyance. The letter reported Marilyn's version of how she was killed. Among other things, the letter intimated that Marilyn's daughter had shot Marilyn after Jaimi had, because she couldn't stand to see her mother suffer.

The defense attorney was unable to convince the prosecuting attorney to dismiss the kidnapping and grand theft charges and to pursue the "second gun" theory. The defense attorney then filed a motion to dismiss the charges. At a hearing on this motion, the defense attorney called Jaimi to testify. The district judge carefully advised Jaimi that he could not be required to testify and gave the defense attorney an opportunity to explain fully to Jaimi his right to remain silent. Jaimi confirmed to the district judge that he understood that he had the right not to testify and that anything he said might be used as evidence against him. Jaimi was then sworn and testified.

In his testimony in support of the motion to dismiss Jaimi related fully the events concerning the alleged kidnapping and theft on June 21 and 22, 1984, as well as the events of July 1, 1984, surrounding Marilyn's death. He testified that when Marilyn came to the barn that morning she picked up the .22 caliber rifle and took it into the house to remove a scope sight that had come with it. He said that Marilyn told him that she was going to tell the girls that day that Jaimi was there and would let Tira take the gun to the gun range and let her sight it in. Jaimi told the court that when Marilyn came back to the barn she had a handful of bullets and loaded the rifle. He said that after going out to the corrals to move some horses, he and Marilyn returned to the barn. He said he asked Marilyn where she had been all night, and that she told him he thought she was sleeping with every guy in the valley. He stated that Marilyn picked up the rifle, pointed it at him, and told him that he was dead and that no other woman was going to have him. He said he heard a click, grabbed the barrel of the rifle and wrestled it away from her. Jaimi testified that Marilyn screamed for Tiffnie to bring Marilyn's shotgun to her, and that when he got the rifle away from Marilyn, she turned around and ran. He said that he saw Tiffnie coming from the house, that he had the rifle at his hip, and that he thought Marilyn might be going to run around and get another gun. He said that he closed his eyes and that the gun went off several times. He opened his eyes and Marilyn was on her knees and bleeding. He said that Marilyn told Tiffnie to leave and that he told Tiffnie to call an ambulance. He testified that as he knelt beside Marilyn, Tiffnie came running toward them with a pistol saying, "I hate both of you guys." He said that Tiffnie fired the pistol two or three times and that he ran out of the barn. He stated that when he realized that Tiffnie was not coming after him he eased back to the barn

and heard Tiffnie talking to her mother. He testified that he saw Tiffnie standing above her mother, heard the pistol go off, and saw Marilyn's hair fly up.

After the district judge denied the motion to dismiss, the defense attorney wrote a letter to the deputy attorney general who had been appointed as a special prosecutor in the case. In this letter the defense attorney set forth Jaimi's version of the events involved in the charges against him. He also sought to have the special prosecutor arrange for Jaimi to be given a polygraph examination and to make his own investigation of the charges. Subsequently, the defense attorney revealed to the special prosecutor all the evidence and information he had regarding the case and arranged for Jaimi to be interrogated by an investigator from the attorney general's office, without the defense attorney being present. This interrogation took place and lasted over two hours. Jaimi divulged a great many more particulars concerning the alleged kidnapping, theft and murder.

On the motion of defense counsel venue was changed to Ada County and the three charges were consolidated for trial. The trial was scheduled to begin in Boise on April 15, 1985. On March 13, 1985, Jaimi indicated that he did not want the defense attorney to continue to represent him. The trial court allowed the defense attorney to withdraw and reappointed the public defender. Jaimi contended that the defense attorney had delegated too much of the investigation in the case to an investigator whom he described as "living in some kind of a fantasy world." Jaimi confirmed that it had been his desire to testify at the hearing on the motion to dismiss, that the decision to do so was a joint decision between him and the defense attorney, and that he agreed that was the best thing to do. Jaimi said he understood that if a new attorney was appointed to represent him, the trial would begin on April 15, 1985. He told the trial court that he wanted the trial to begin on that day. The trial court agreed that the defense attorney would be allowed to sit at counsel table with the public defender during the trial.

The trial began as scheduled on April 15, 1985. Before any evidence was received, the public defender moved to preclude the prosecution from using in any fashion Jaimi's statements during his testimony at the hearing on the motion to dismiss and during his interrogation by the investigator from the attorney general's office. The trial court denied the motion.

At the conclusion of the prosecution's case, the public defender moved to dismiss the kidnapping and theft charges on the ground that the court lacked jurisdiction, since there was no proof that the crimes occurred in Jerome County. The trial court agreed and dismissed the charges. The public defender then moved to strike all of the evidence that had been admitted relating to the kidnapping and theft cases. The court denied the motion on the ground that the evidence would have been admissible in the murder case in any event. The trial court informed the jury that the charges had been dismissed. The trial then proceeded on the murder charge.

Jaimi did not testify at the trial. The public defender chose not to call him. The public defender felt that Jaimi's testimony would be "nit picked" by the prosecution, because of the availability of Jaimi's version of the events surrounding Marilyn's death provided by Jaimi's testimony at the hearing on the motion to dismiss, by the defense attorney's letter to the special prosecutor, and by Jaimi's interrogation by the investigator for the attorney general. The defense presented on Jaimi's behalf was designed to convince the jury that Jaimi shot Marilyn but did not kill her, or, that if he did kill her, he did not intend to. The defense argued that the killing did not amount to first degree murder.

Among the instructions given to the jury by the trial court was one concerning lesser included offenses. This instruction included a provision that the jury "should consider the included offenses only in the event the state has failed to convince you beyond a reasonable doubt of the guilt of the accused with respect to the crime charged."

Following the jury's verdict that Jaimi was guilty of first degree murder, a pre-

sentence report was prepared and the trial court conducted sentencing hearings. At the time of these hearings, Jaimi was represented by another private defense attorney (the second defense attorney). At one of these sentencing hearings a letter written to the trial judge by Marilyn's father was admitted in conjunction with the father's testimony. This letter described the relationship between Jaimi and Marilyn, including Jaimi's physical abuse of Marilyn and the circumstances surrounding Marilyn's shooting Jaimi in August 1983. The letter also discussed Jaimi's violent nature, his harassment of the Arbaugh family after Marilyn's death, the lack of any likelihood that Jaimi could be rehabilitated, and hearsay statements that were adverse to Jaimi. The letter had not been submitted with the presentence report, but the presentence report contained some of the same information in the form of statements from Marilyn's parents. Mr. Arbaugh adopted the letter as part of his testimony at the sentencing hearing. The trial court admitted the letter and added, "taking into consideration that probably great portions of it may be hearsay and stimulated by some prejudice and sympathy, and I will take that into consideration when reviewing it." The prosecutor asked Mr. Arbaugh the following question: "Mr. Arbaugh, is there anything else you would like to say to the Court as to what you think ought to happen to Mr. Charboneau in view of the damage caused to your family by his actions?" In response, Arbaugh stated:

Well, I think anyone that's been around him that, the last two years that he was loose, knows if he was ever on the street again that the Arbaugh family would be going through the same thing again. He's vowed to destroy the Arbaugh family, and you see what he done to start with. There's no doubt in my mind that he wouldn't try to kill the rest of us.

He gave his opinion that Jaimi should be put to death or given a fixed life sentence. The second defense attorney was given an opportunity to cross-examine Mr. Arbaugh.

Following the sentencing hearings, the trial court made findings concerning aggravation and mitigation and sentenced Jaimi to death. Among the facts found by the trial court was that at the time Tiffnie went to the barn after she heard the first shots fired on July 1, 1984, Marilyn's life "probably could have been saved if she had received the necessary medical attention." The trial court also found that within not less than two minutes after leaving the barn Tiffnie heard more shots. The trial court concluded:

That after firing the first volly (sic) of shots the victim Marilyn Arbaugh was wounded but her life could have been saved if she had received necessary medical attention. At that moment the defendant, Jaimi Charboneau had a choice. He could have saved the woman he professed to love. However, with at least two minutes to give thought to the matter, the defendant, Jaimi Dean Charboneau, chose to fire additional shots into the wounded and helpless body of Marilyn Arbaugh. It appears from the facts that Jaimi Dean Charboneau acted intentionally, methodically and violently while he erased from the face of this earth the life of a human being.

The trial court found "beyond a reasonable doubt that the facts establish the statutory aggravating circumstances set forth in Idaho Code Section[s] 19–2515(g)(5) and 19–2515(g)(6)." The trial court was "unable to find any mitigating circumstances which would overcome or outweigh the aggravating circumstances."

The second defense attorney filed an application for post conviction relief, including claims of ineffective assistance of counsel. Following a hearing on this application, the trial court denied the post conviction relief.

Following the appointment of the second defense attorney to become a district judge, he was allowed to withdraw as Jaimi's attorney. The trial court then appointed another attorney (the second public defender) to represent Jaimi. The second public defender filed another application for post-conviction relief alleging, among other things, newly discovered evidence relating to ineffective assistance of counsel.

The hearing on this application dealt with a claim that the defense attorney had relied on "supernatural, clairvoyant phenomena to dictate his strategy in defending Jaimi." The trial court found that the letter the defense attorney had received from his niece shortly after August 23, 1984, did not influence the manner in which the defense attorney defended the case. The trial court denied post-conviction relief.

This Court has before it the mandatory review of Jaimi's death sentence, together with appeals from his conviction and from the denials of post-conviction relief. There are a plethora of issues involved in this case. We will address each of them in turn.

## II.

### DID CHARBONEAU RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL?

A. The standards.

1. Federal.

■This Court has recently restated the test for determining whether a defendant has been denied effective assistance of counsel under the Constitution of the United States: "First, a claimant must prove that counsel's performance was deficient. Second, a claimant must show that this deficient performance prejudiced his or her case. [Citing *Strickland v. Washington*, 466 U.S. 668, 680, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 686 (1984) ]" *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988).

In *Aragon* this Court also pointed out that "there is a strong presumption that counsel's performance falls within the 'wide range of professional assistance,'" and that "the defendant bears the burden of proof to show that 'counsel's representation fell below an *objective* standard of reasonableness.'" *Id.* at 760, 760 P.2d at 1176. Unless prejudice is presumed, "the defendant must affirmatively prove prejudice." *Id.* at 761, 760 P.2d at 1177. Prejudice is presumed only in cases such as "where the defendant is denied counsel altogether, or where counsel represents conflicting interests." *Id.* at 761, 760 P.2d at 1177.

2. State.

■ In *Aragon* this Court cited *Gibson v. State*, 110 Idaho 631, 635, 718 P.2d 283, 287 (1986) for the proposition that " 'the Idaho Constitution potentially can be read to afford a broader right to effective counsel than does the federal Constitution.' " The Court then opined:

> To date that has not taken place. However, as noted in *Gibson*, we have not yet been required to define the differences between the rights afforded by federal and state constitutions. [Citation omitted.] Nor are we required to do so here. Our review of the record persuades us that the district court did not err in concluding that Aragon failed to establish that counsel's conduct contributed to the conviction.

114 Idaho at 761, 760 P.2d at 1177.

From *Aragon* we are bound to conclude that it remains the burden of one claiming ineffective assistance of counsel under the Idaho Constitution to prove that "counsel's conduct contributed to the conviction."

The starting point in evaluating counsel's conduct under the state constitution remains the American Bar Association's standards entitled "The Defense Function." (The ABA standards). *Aragon*, 114 Idaho at 761, 760 P.2d at 1177.

B. The issues.

1. Jaimi's testimony at the motion to dismiss hearing.

■ Reviewing Jaimi's testimony at the hearing on the motion to dismiss does not convince us that this testimony proves that he was denied effective assistance of counsel. While any of us in hindsight might conclude that Jaimi should not have testified at the hearing and given the prosecution five months to investigate the story he told, looking at the case as a whole, we cannot say that Jaimi has proved that the reliability of the result at trial would have been different if he had not testified at the hearing.

At the hearing Jaimi testified that Tiffnie had shot Marilyn with Marilyn's pistol after Jaimi had left the barn. Jaimi has continued to assert this version even after his conviction and even after his sentencing. Presumably this is the version that he would have told, if he had testified at trial. It was Jaimi's choice whether to testify at trial. The public defender advised him not to, and Jaimi accepted this advice. We can only speculate whether his testimony would have been impeached and whether the jury would have believed his testimony. It is Jaimi's burden to prove that the reliability of the result has been affected because he testified at the hearing on the motion to dismiss. We are not convinced that the reliability of the result was affected.

The premise of the claim of ineffective assistance of counsel with regard to Jaimi's pretrial testimony is that the defense attorney placed Jaimi on the stand without any legitimate reason or purpose. While it may not have been the game plan that other attorneys would have followed, we may not second guess counsel's strategic and tactical choices. *Aragon*, 114 Idaho at 761, 760 P.2d at 1177. The defense attorney testified in conjunction with the post-conviction relief proceedings that he knew the murder case was going to trial. He said that his objective in having Jaimi testify at the hearing on the motion to dismiss was to "embarrass the prosecutor into looking to the true facts" of the kidnapping and grand theft cases. The defense attorney disavowed any anticipation that the murder charge would be dismissed. Despite this stated lack of anticipation during the hearing on the motion to dismiss, the defense attorney questioned Jaimi in detail about the events leading to Marilyn's death on July 1, 1984. He also argued to the district judge that the murder charge should be dismissed on the ground that there was not sufficient evidence submitted at the preliminary hearing to support a finding of probable cause. While this inconsistency is troubling to us, we are unable to conclude that the defense attorney failed to render effective assistance of counsel to Jaimi concerning the pretrial testimony.

When confronted with the defense of serious felony charges such as those in this case, defense counsel may have to rely on creative and sometimes risky tactics to secure the best possible result for a defendant. We are not prepared to say that the decision to have a defendant testify in a pretrial proceeding is sufficient to indicate ineffective assistance of counsel. We find nothing in the American Bar Association's standards relating to "The Defense Function" that would indicate a deficiency of the defense attorney in calling Jaimi as a witness at the hearing on the motion to dismiss.

Three experienced and respected criminal defense attorneys testified at the first post-conviction proceeding that it was not competent representation for the defense attorney to have called Jaimi as a witness at the hearing on the motion to dismiss. These attorneys also testified that other actions of the defense attorney constituted incompetent representation. While we are respectful of the opinions of these attorneys, it is for us to determine in each case whether the constitutional mandate of effective assistance of counsel has been fulfilled. The question is one of law and not one of fact.

2. Divulging information and evidence to special prosecutor.

■ The letter of the defense attorney to the special prosecutor that was written after the hearing on the motion to dismiss, together with the conversation of the defense attorney with the special prosecutor, divulged all of the information and evidence that the defense attorney and his investigator had developed about the case. While other attorneys might not have pursued this course, we are not persuaded that this constituted a violation of Jaimi's right to effective assistance of counsel.

The defense attorney's stated purpose in divulging the information and evidence was to convince the special prosecutor to conduct an independent investigation. The defense attorney believed that if the special prosecutor and his investigators would pursue this investigation they would conclude

that Jaimi was telling the truth and the cases would be resolved favorably. This may seem like a naive plan to those looking back now, but it is apparent that at the time, the defense attorney was convinced that this was the best course of action. He testified later that he wanted a polygraph examination of Jaimi and hoped that the special prosecutor would be persuaded by the investigation to give Jaimi the examination at state expense. He stated that resources were not available to him to have the examination otherwise. He stated that he did not believe that the district judge would have granted Jaimi the right to have a polygraph examination at county expense.

Even though divulging this information and evidence by the defense attorney did not produce the result the defense attorney wanted, we are not persuaded that it was ineffective assistance for the defense attorney to have tried this tactic. There is no portion of the ABA standards that prohibits disclosures such as these by a defense attorney. It is true that Standard 4–3.1 requires that "the lawyer should explain the obligation of confidentiality which makes privileged the accused's disclosures relating to the case." Here, Jaimi had already testified to his actions in relationship to the charges. The defense attorney divulged nothing new about Jaimi's version. The other information and evidence divulged by the defense attorney was the result of investigation by the defense attorney and his investigator, not what Jaimi had told them.

### 3. Jaimi's interrogation by the investigator.

■ The interrogation of Jaimi by the investigator from the attorney general's office was merely an extension of the plan that the defense attorney had initiated by divulging the information and evidence that were contained in his letter to the special prosecutor and his conversation with the special prosecutor and his investigators. We are not persuaded that allowing Jaimi to be interrogated by the investigator without counsel being present constituted ineffective assistance of counsel.

The defense attorney testified in the first post-conviction proceeding that he discussed the interrogation with Jaimi before it occurred, that he explained Jaimi's right to remain silent, and that Jaimi agreed that he should submit to the interrogation.

### 4. Failure to apply for funds to assist in the defense and failure to employ experts.

■ The defense attorney did not apply to the trial court for funds to investigate or to employ experts. No facts are asserted that would have been discovered by additional investigation. No expert testimony is offered that could have been produced if funds had been sought from the trial court. In the absence of this proof, we find no evidence of ineffective assistance of counsel on these grounds.

### 5. Inadequate investigation.

The defense attorney employed an investigator whom the defense attorney later described as a "flake." Jaimi now complains that the defense attorney did not investigate the charges thoroughly enough. Standard 4–4.1 of the ABA standards sets out the defense attorney's duty to investigate the circumstances of Jaimi's case. Jaimi has not presented any evidence in order to substantiate that an inadequate investigation affected the outcome of the case.

### 6. Inadequate preparation for trial and failure to request continuance.

■ The public defender was appointed to replace the defense attorney approximately three weeks prior to trial. The public defender testified at the first post-conviction proceeding that he found that the case was not prepared for trial. He stated that he should have requested that the trial court vacate the trial to allow him to investigate the case further and to prepare for trial. No evidence has been offered as to what new facts or defenses could have been developed if the trial had been continued and further preparation conducted.

### 7. Consolidation of cases.

■ The defense attorney sought and obtained the consolidation of the trials on the three charges on the premise that it would be to Jaimi's advantage to have all the facts concerning the events from June 21 through July 1, 1984, presented to the jury. Although many defense attorneys might not agree with this approach, we are not prepared to say that this choice amounted to ineffective assistance of counsel.

In his testimony at the first post-conviction proceeding the defense attorney described his reason for seeking the consolidation:

> Well, ... they were all so interrelated that the only way that we could show that it was really the intent of Marilyn to murder Jaimi, rather than the other way around, that and from what Jaimi had told us that he had wrestled the gun, that she pointed the rifle at him and pulled the trigger, but it didn't go off, and that he took the gun away from her, and then is when she went dancing down the hall and when he shot her, and none that of (sic) would have had any meaning to the jury at all unless they had the whole scenario which would include the phoney (sic) rape allegation and the phony (sic) kidnap allegation.

He also testified that he discussed the motion with Jaimi before it was made.

Standard 4–5.2 of the ABA standards provides that the only decisions that must be made by the accused after full consultation with counsel are what plea to enter, whether to waive jury trial, and whether to testify. This standard states:

> (b) The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.

There was no obligation for the defense attorney to leave the decision on whether to request consolidation to Jaimi. We will not second guess the decision.

### 8. Reliance on clairvoyance.

■ In the decision on the second application for post-conviction relief the trial court found that none of the evidence directly established that the letter the defense attorney received from his niece about her clairvoyant contact with Marilyn had any influence on the manner in which the defense attorney defended the case. Our review of the record confirms this finding. Jaimi claims that the defense attorney relied upon his niece's clairvoyant contact with Marilyn and, therefore, did not investigate any alternative defenses. Standard 4–4.1 of the ABA standards sets out the defense attorney's duty to investigate the circumstances of Jaimi's case. We conclude that this standard was not violated. The discussion of the defense attorney with his niece concerning Tiffnie's participation in the death of her mother occurred after Jaimi had related his new version of the facts to the defense attorney. There is no evidence to support the supposition that Jaimi's new version implicating Tiffnie was provoked by the clairvoyance of the defense attorney's niece or the defense attorney's belief in it. In the absence of such evidence we are not prepared to use reliance on clairvoyance as a basis for ineffective assistance of counsel.

### 9. Failure to have psychological or psychiatric examination.

■ Jaimi asserts that the public defender or the defense attorney should have advised him about being examined by a psychiatrist or a psychologist before trial. No evidence is offered that would establish any defense for Jaimi through such expert testimony. The psychologist who examined Jaimi after his conviction and who testified in conjunction with the sentencing did not offer any opinion that would excuse the killing. His testimony indicated only that there was some possibility that Jaimi could be rehabilitated. We are unable to conclude that the failure to have Jaimi examined before the trial constituted ineffective assistance of counsel.

10. Excessive use of alcohol.

■ Jaimi contends that the defense attorney came to his cell on many occasions when the defense attorney was under the influence of alcohol. Even if we assume these allegations are true, no evidence is offered to show in what way this affected the defense attorney's representation of Jaimi.

11. Failure to object to evidence and to request mistrial.

■ The prosecutor referred in his opening statement to two "hot" checks that Jaimi had reportedly written in Battle Mountain, Nevada. When the checks were offered, the public defender objected, and the checks were not admitted. Jaimi argues that the failure of the public defender to object to the statement of the prosecutor and to move for a mistrial constituted ineffective assistance of counsel. We cannot agree. No connection is made between the checks and the murder. We must assume that the jury followed the instructions of the trial court and made its judgment in the case based on the evidence presented and not on statements of counsel concerning evidence that was not connected with the homicide.

12. Failure to request a new trial.

Jaimi asserts that the public defender should have moved for a new trial. No basis for such a motion is suggested. We find no basis for supporting an ineffective assistance of counsel claim on this ground.

AS TO PART II: SHEPARD, C.J., BAKES and HUNTLEY, JJ., concur.

BISTLINE, J., dissents.

### III.

### WAS THE LESSER INCLUDED OFFENSE INSTRUCTION ERRONEOUS?

■ Jaimi asserts that the trial court erred in giving the jury Instruction No. 15, concerning lesser included offenses. This instruction stated:

The law permits the jury to find the defendant guilty of any lesser offense which is necessarily included in the crime charged in the Information, whenever such a course is consistent with the facts found by the jury from the evidence in the case, and with the law as given in the instructions of the Court.

When you are deliberating with respect to each count, you should first consider the crime charged. You should consider the included offenses only in the event the State has failed to convince you beyond a reasonable doubt of the guilt of the accused with respect to the crime charged.

The jury will bear in mind that the burden is always upon the Prosecution to prove beyond a reasonable doubt every essential element of any lesser offense which is necessarily included in any crime charged in the Information; the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Jaimi argues that the second sentence of the second paragraph of this instruction required the jury to agree unanimously to acquit Jaimi of first degree murder before they could consider any lesser included offenses. In support of this position Jaimi presents the instruction given by the trial court which states: "The verdict reached in this case must be unanimous, that is, you must agree unanimously as to whether the defendant is guilty or not guilty as regards any offense." *State v. Korbel*, 231 Kan. 657, 647 P.2d 1301 (1982) is cited as a basis for Jaimi's position on the error asserted. We find no error in the instruction given on lesser included offenses.

The major premise of the argument that Instruction No. 15 was erroneous is that the words "failed to convince you beyond a reasonable doubt" would be interpreted by the jury to mean "if you unanimously agree." The fallacy in this major premise is that the words "failed to convince you beyond a reasonable doubt" could reasonably only be interpreted by the jury to mean "if you cannot agree." These are

precisely the words that the Kansas Supreme Court found to cure any problem with the instruction that was at issue in *Korbel.*

Instruction No. 15 allowed the jury to consider lesser included offenses if they could not agree that Jaimi was guilty of first degree murder. That was a correct statement of the law. We note that in *State v. Gilman,* 105 Idaho 891, 673 P.2d 1085 (Ct.App.1983) *rev. den.* (1984) our Court of Appeals considered an instruction relating to lesser included offenses. The comparable language in the instruction at issue there was: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of [the offense charged], you may still find him guilty of any such lesser offense...." *Id.* at 897, 673 P.2d at 1091. While the point at issue in *Gilman* was not the same as presented here, our Court of Appeals did not question the propriety of this portion of the instruction. We denied review of the case. We are reinforced in our conclusion here by the implicit approval of this similar language in the instruction in *Gilman.*

AS TO PART III: SHEPARD, C.J., BAKES, BISTLINE and HUNTLEY, JJ., concur.

## IV.

FAILURE TO SUPPRESS USE OF JAIMI'S TESTIMONY AT THE HEARING ON THE MOTION TO DISMISS AND HIS STATEMENTS IN THE INTERVIEW WITH THE INVESTIGATOR FOR THE ATTORNEY GENERAL.

 Jaimi asserts that the trial court erred when it refused to suppress the use of the testimony he gave at the hearing on the motion to dismiss and the statements he made in his interview with the investigator for the attorney general's office. The motion to suppress was presented to the court before the receipt of any evidence in the trial of this case. In denying the motion the trial court stated:

Well, my ruling will be as follows, and for the record I want to make it clear

why I am ruling the way I am. As I related to you last evening at the conclusion of your motion, at the time we had the motion to dismiss hearing and at which time Mr. Charboneau did testify, I was very careful, I feel, in admonishing the defendant and advising him of his right to remain silent, that he did not have to testify, that if he did testify that anything he may say, that he would say, may later be used against him. We went into a second day on that hearing, and again on the second day I admonished him. I don't know what else you can do. I think he has the right if he so desires to waive his right to remain silent. He has the right to take the witness stand. He has the right to give testimony. In this motion he wants me to suppress it because he waived his right to remain silent and made a statement.

And it's interesting for the record to note that Mr. Charboneau through counsel filed a lawsuit in Jerome County in a habeas corpus action alleging that we were violating his First Amendment right to freedom of speech. And a similar action involving Mr. Charboneau against the Sheriff of Jerome County is pending in Federal Court again alleging that he's violated Mr. Charboneau's right to freedom of speech, his First Amendment right. So it's a little inconsistent when on one hand you're complaining that his rights to remain silent were violated because he waived that right and took the stand, and then on the other hand he's complaining because we are violating his rights to freedom of speech. Inconsistent.

That's a lengthy way to get to my ruling, but I want it as a matter of this record so that in review of this matter the higher court will know why I am ruling the way I am. The motion is denied. The State has the right to use the testimony from that hearing on the motion to dismiss, and the State has the right to use the interview between the defendant and Mr. Carr in all respects.

The record of the hearing on the motion to dismiss indicates that Jaimi was given

ample advice both by the district judge and by the defense attorney of his right to remain silent. The interview between Jaimi and the investigator for the attorney general's office took place at the request of the defense attorney. Jaimi consented to talk with the investigator, was advised of his constitutional rights before the interview, and waived those constitutional rights.

To the extent that the State relied at the trial on any of Jaimi's testimony at the hearing on the motion to dismiss or his statements to the investigator for the attorney general's office there was no violation of Jaimi's rights. In fact, the record indicates that at trial the State did not attempt to rely on Jaimi's testimony at the hearing and used only a very minor portion of his statements to the investigator.

AS TO PART IV: SHEPARD, C.J., BAKES, BISTLINE and HUNTLEY, JJ., concur.

## V.

### WAS PREJUDICIAL EVIDENCE ADMITTED ENTITLING JAIMI TO A NEW TRIAL?

 Jaimi asserts that the trial court admitted inadmissible prejudicial evidence entitling Jaimi to a new trial. While it is not entirely clear from the brief filed on Jaimi's behalf, the following are apparently the items of evidence that are referred to in this issue:

Pictures of Marilyn's two children.

Pictures of Marilyn's vehicle showing the vehicle identification numbers had been either totally or partially removed.

Testimony of Marilyn's boyfriend as to statements Marilyn made on June 30, 1984, regarding Jaimi.

The record indicates that the only motion for new trial filed on behalf of Jaimi related to newly discovered evidence. In the absence of a motion for new trial on the basis of the allegedly inadmissible prejudicial evidence, there is no proper basis to bring this issue before this Court. In any event, we see no error in the trial court's admission of the evidence questioned in

this issue. The only portion of this evidence that raises any question of impropriety is the testimony of Marilyn's boyfriend who was out with her the night before her death. The defense offered evidence of the relationship of Marilyn and Jaimi up to the time of her death. In rebuttal the State offered the testimony of the boyfriend as to statements made to him by Marilyn the night before her death about her relationship with Jaimi. The boyfriend's testimony indicated that Marilyn told him she was worried because she did not know where Jaimi was. That testimony was admissible under I.R.E. 803, as evidence of her existing state of mind.

AS TO PART V: SHEPARD, C.J., BAKES, BISTLINE and HUNTLEY, JJ., concur.

## VI.

### FAILURE TO STRIKE EVIDENCE OF GRAND THEFT AND KIDNAPPING AFTER DISMISSAL OF THOSE CHARGES.

 Jaimi asserts that the trial court erred by failing to strike from the record all evidence pertaining to the grand theft and kidnapping charges after those charges had been dismissed for lack of jurisdiction. At the time the trial court denied the motion to strike this evidence, the district judge stated that the evidence pertaining to the grand theft and kidnapping would have been admissible, even if those charges had not been filed and consolidated with the first degree murder charge. The district judge stated: "This thing occurred over a period of some ten or twelve days and I think the jury needs the benefit of all of that testimony in order to properly arrive at a decision, whichever way they decide." We agree.

I.R.E. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

In *State v. Needs*, 99 Idaho 883, 892–93, 591 P.2d 130, 139–40 (1979) this Court approved the admission of evidence that two weeks prior to the homicide the defendant assaulted the victim with a butcher knife on the grounds that the evidence of this assault tended to show the defendant's motive or intent. We believe the same is true of the evidence of the kidnapping and grand theft here. The circumstances of these acts indicated the hostility of Jaimi toward Marilyn.

AS TO PART VI: SHEPARD, C.J., BAKES and HUNTLEY, JJ., concur.

BISTLINE, J., dissents.

## VII.

### WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE VERDICT?

 Jaimi asserts that there was not sufficient evidence to support the verdict of the jury. We disagree.

As this Court has pointed out in another recent first degree murder case where this same issue was presented:

In analyzing appellant's contention, the appropriate standard of review is whether there is substantial competent evidence to support the jury's verdict. [Citations omitted] Our function on appeal is to examine the supporting evidence, not to place ourselves in the jury's position or reweigh the significance of evidence as it relates to specific elements. [Citations omitted.] On appeal, all facts, and inferences to be drawn from those facts, are construed in favor of upholding the lower court decision.

*State v. Aragon*, 107 Idaho 358, 366, 690 P.2d 293, 301 (1984).

The evidence in this case, together with the inferences that the jury could have drawn from that evidence, provide a sufficient basis for the verdict of the jury. Jaimi had previously perpetrated several acts of violence toward Marilyn. He had also made threats to kill her. He purchased the rifle a few days before Marilyn's death.

Shortly before Marilyn's death Tiffnie heard shots. When she went to the barn to investigate, Tiffnie observed Jaimi holding a rifle pointed at Marilyn as Marilyn sat wounded on the ground. A short time later, Tiffnie and Tira heard more shots and found their mother apparently dead. Jaimi was found by the investigating officers in a nearby field with the rifle lying nearby. At the time of his apprehension Jaimi acknowledged to the arresting officers that he had shot Marilyn. These facts and the inferences were sufficient for the jury to find that Jaimi unlawfully killed Marilyn with malice aforethought, wilfulness, deliberation, and premeditation. *State v. Warden*, 100 Idaho 21, 592 P.2d 836 (1979).

AS TO PART VII: SHEPARD, C.J., BAKES and HUNTLEY, JJ., concur.

BISTLINE, J., expresses no opinion.

## VIII.

### POST–CONVICTION HEARINGS.

#### A. The first hearing.

Jaimi asserts that the findings of fact and conclusions of law of the trial court after the first post-conviction hearing were erroneous. This hearing dealt with the alleged ineffective assistance of counsel. We have reviewed the findings of fact in light of the evidence submitted at the hearing and find that these findings were supported by substantial competent evidence. The conclusions of law announced by the trial court are consistent with our conclusions here as to the ineffective assistance of counsel based on the facts submitted at the hearing. We find no error in them.

#### B. The second hearing.

##### 1. Failure to consider evidence.

At the second post-conviction hearing the trial court limited the evidence to matters that were not presented on the original application for post-conviction relief. At the hearing the primary issue that was addressed was the purported reliance of the defense attorney on clairvoyance in preparing Jaimi's defense. The public defend-

er also testified regarding his state of preparation before trial and how the errors of the defense attorney prejudiced his ability to defend Jaimi. Jaimi asserts that the trial court failed to consider the testimony of the public defender at this hearing.

The transcript of the second post-conviction hearing reveals that the trial court allowed testimony of the public defender relating to matters that were considered at the first hearing "for foundation purposes in order to make more clear [the] testimony in this matter." The trial court stated definitely that it was not going back and adjudicating any of those issues that it had already ruled on in the original application. The second defense attorney stated to the trial court that he did not intend to relitigate those issues, "but rather to show how those issues affected the trial stage of this case." The trial court then commented:

> For guidance, counsel, I will agree with you, that if you are going to proceed on this amended application for post-conviction relief, alleging that the defendant's Sixth Amendment rights were violated, you do have to show not only that they were violated but how they affected the trial of this case, so I would allow you to show that and, likewise, go back into it.... But I'm not going to relitigate any of those other issues.

In the findings of fact and conclusions of law rendered by the trial court after the second post-conviction hearing, the trial court stated that the only new issue raised concerned a claim that the defense attorney relied "on supernatural, clairvoyant phenomena to dictate his strategy in defending Jaimi Charboneau and, therefore, allegedly rendered ineffective the assistance of counsel provided by [the defense attorney]."

We conclude from this record that the trial court did not intend to consider the testimony of the public defender that went beyond this new issue, except by way of background. We agree that this was proper. Essentially, Jaimi contends that the trial court failed to consider the effect that the defense attorney's reliance on clairvoyance had on the public defender's ability to render effective assistance to Jaimi in the

trial. The fallacy in this position is that in its findings and conclusions after the second post-conviction hearing the trial court concluded that clairvoyance played no part in the strategy for Jaimi's defense developed by the defense attorney. Therefore, we conclude that there was no basis for the trial court to rule that this strategy affected the public defender's defense of Jaimi.

2. Were the findings and conclusions erroneous?

Jaimi asserts that the findings of fact and conclusions of law rendered by the trial court after the second post-conviction hearing were erroneous. We have reviewed those findings and conclusions. The findings of fact are supported by substantial competent evidence. The conclusions of law are in concurrence with our own conclusions contained in this opinion concerning the relationship of clairvoyance to the effective assistance of counsel.

AS TO PART VIII: SHEPARD, C.J., BAKES and HUNTLEY, JJ., concur.

BISTLINE, J., expresses no opinion.

IX.

SENTENCING.

A. Participation of jury.

Jaimi asserts that the imposition of the death penalty with no participation by the jury in the sentencing process violates the sixth, eighth, and fourteenth amendments to the Constitution of the United States. He also contends that the sentence was unconstitutional because he was denied a jury determination of the aggravating circumstances enumerated in I.C. § 19–2515(g).

In 1983 this Court held "that there is no federal constitutional requirement of jury participation in the sentencing process and that the decision to have jury participation in the sentencing process, as contrasted with judicial discretion sentencing, is within the policy determination of the individual states." *State v. Creech*, 105 Idaho 362, 373, 670 P.2d 463, 474 (1983) *cert. den.* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722

(1984). *See also State v. Sivak*, 105 Idaho 900, 902, 674 P.2d 396, 398 (1983) *cert. den.* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985) *cert. den.* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). In 1984 the United States Supreme Court upheld death sentencing by trial judges. *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).

This Court has also held "that Art. 1, § 7, of the Idaho Constitution does not require the participation of a jury in the sentencing process in a capital case." *Sivak*, 105 Idaho at 904, 674 P.2d at 400. *See also State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989).

Jaimi contends that despite these decisions, since I.C. § 19–2515(g) "links an enhanced punishment to specific enumerated factual findings," it "usurps the jury's fundamental role in deciding whether the fact is so." In *Richmond v. Arizona*, 434 U.S. 1323, 98 S.Ct. 8, 54 L.Ed.2d 34 (1977) Justice Rehnquist, sitting as a circuit justice, denied an application for suspension of an order denying certiorari or, in the alternative, for a stay of execution. In his opinion Justice Rehnquist stated:

> Applicant raises a second argument in his petition for rehearing that was not raised either before the Arizona Supreme Court or in his earlier petition for certiorari. Applicant argues that the Arizona statute violates the Sixth, Eighth, and Fourteenth Amendments in failing to provide for jury input into the determination of whether aggravating and mitigating circumstances do or do not exist. Such jury input would not appear to be required under this Court's decision in *Proffitt* [*v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)].

434 U.S. at 1325, 98 U.S. at 9, 54 L.Ed.2d at 36.

Jaimi correctly points out that this issue was not presented to the entire Supreme Court, but only to Justice Rehnquist. Jaimi argues that *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) supports his position on this issue. It is interesting that Justice Rehnquist also wrote the opinion for the Court in *McMillan*, including the statement "that there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." 477 U.S. at 88, 106 S.Ct. at 2420, 91 L.Ed.2d at 76. In his decision Justice Rehnquist cited *Proffitt* for the proposition: "Sentencing courts necessarily consider the circumstances of an offense in selecting the appropriate punishment, and we have consistently approved sentencing schemes that mandate consideration of facts related to the crime,...." 477 U.S. at 88, 106 S.Ct. at 2420, 91 L.Ed.2d at 76. The crux of the decision in *McMillan* was the conclusion that the fact at issue there—visible possession of a firearm—was not an element of the crimes for which the defendants were convicted, but were instead "a sentencing factor that comes into play only after the defendant has been found guilty...." *McMillan*, 477 U.S. at 84, 106 S.Ct. at 2416, 91 L.Ed.2d at 72. That is how we view the aggravating circumstances listed in I.C. § 19–2515(g).

To accept Jaimi's argument that the jury must be involved in determining whether aggravating circumstances exist, we would have to conclude that the aggravating circumstances listed in I.C. § 19–2515(g) are elements of first degree murder. We are unable to reach that conclusion. The circumstances listed in the statute are clearly circumstances to be considered in sentencing and not elements of first degree murder. It is not unconstitutional for a judge, instead of a jury, to determine whether any of the aggravating circumstances listed in the statute exist.

Our opinion in this aspect of the case is not changed by the decision of the Ninth Circuit in *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988). In *Adamson* the Ninth Circuit held Arizona's death penalty sentencing statutes to be in violation of the sixth amendment. During reargument of this case to determine what impact *Adamson* might have on our opinion here, the solicitor general for the state of Idaho acknowledged that there is no significant dif-

ference between the Arizona death penalty sentencing statutes and those of Idaho. Nevertheless, we are not convinced that *Adamson* correctly states the requirements of the sixth amendment on this issue.

Judicial sentencing in capital cases does not violate the sixth amendment. *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). *Adamson* attempts to distinguish *Spaziano* on the ground that in *Spaziano* "the Court never reached the particular contention *Adamson* has raised: that Arizona's capital sentencing statute requires the judge to determine elements of the offense charged, thereby taking this factual element out of the jury's hands in violation of the Sixth Amendment." 865 F.2d at 1028. We disagree.

In *Spaziano* the Court noted that the Florida capital sentencing statute that was at issue directed the sentencing judge "to determine whether statutory aggravating circumstances were outweighed by statutory mitigating circumstances." 468 U.S. at 450 n. 4, 104 S.Ct. at 3157 n. 4, 82 L.Ed.2d at 343 n. 4. The Florida statute was similar in the important aspects to those portions of I.C. § 19–2515 relating to death penalty sentencing. The Florida statute provided that the sentencing judge should weigh the aggravating and mitigating circumstances. If the judge imposed a sentence of death, the judge was required to set forth in writing "findings upon which the sentence of death is based as to the facts: (a) That sufficient aggravating circumstances exist as enumerated in subsection (5), and (6) That there are insufficient mitigating circumstances to outweigh the aggravating circumstances." 1972 Fla. Laws, ch. 72–724, Sec. 921.141(3)(b). The aggravating circumstances enumerated in the Florida law at issue in *Spaziano* were similar in some respects to those contained in I.C. § 19–2515(g). Significantly, one of the aggravating circumstances in Florida was: "The capital felony was especially heinous, atrocious, or cruel." 1972 Fla. Laws, ch. 72–724, Sec. 921.141(6)(h). This is substantially the same as I.C. § 19–2515(g)(5) that is at issue here, except

that our statute adds the qualifying phrase, "manifesting exceptional depravity."

The Florida Supreme Court noted in its decision "the trial judge found that the circumstances of the offense were especially heinous, atrocious, and cruel, and secondly, found that the defendant was previously convicted of felonies involving the use or threat of violence to the person." *Spaziano v. State*, 393 So.2d 1119 (Fla. 1981). On certiorari the United States Supreme Court held:

> The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause, however, does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial. ... The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final. *Arizona v. Rumsey*, [467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) ]. More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. [Citations omitted, except] *Williams v. New York*, 337 U.S. 241, 247–249, 69 S.Ct. 1079, 1083–1084, 93 L.Ed. 1337 (1949). The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.

468 U.S. at 454, 104 S.Ct. at 3161, 82 L.Ed. 2d at 347.

These comments were made by the Court in considering death penalty sentencing by a judge under a statute substantially similar to our statute and with findings of aggravating circumstances similar to those here. This convinces us that the Court inherently considered and rejected the premise of the Ninth Circuit in *Adamson:* that a capital sentencing statute that requires the judge to determine aggravating circumstances takes this factual element out of the jury's hands in violation of the sixth amendment.

**148**

AS TO PART IX(A): SHEPARD, C.J., and BAKES, J., concur.

BISTLINE and HUNTLEY, JJ., dissent.

**B. The letter from Marilyn's father.**

**1. Hearsay.**

■ Jaimi asserts that it was a violation of the hearsay rule for the trial court to admit the letter written by Marilyn's father. We agree.

Prior to the sentencing hearings, the second defense attorney filed a motion "for a formal sentencing hearing in accordance with the provisions of Idaho Code §§ 19–2515, 19–2516, and that the defendant be afforded all of the rights, both procedural and substantive, therein provided." I.C. § 19–2516 states:

> The circumstances [in aggravation or mitigation of punishment] must be presented by the testimony of witnesses examined in open court, except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section.

I.C. § 19–2515(d) provides for a presentence investigation in all death penalty cases and states that after the investigation the court shall "convene a sentencing hearing for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense. At such hearing, the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation."

This Court has approved the consideration by a sentencing judge in a death penalty case of the presentence investigation report provided for in I.C. § 19–2515(d), despite the requirement for live testimony in I.C. § 19–2516. *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983). In reaching its decision in that case this Court stated: "We hold that the closing language of I.C. § 19–2516 clearly and unambiguously provides an exception to the otherwise required oral testimony and that those authorizations of I.C. § 19–2515 fall within the purview of the intended exception." 105 Idaho at 368, 670 P.2d at 469. We note that in *Creech* the defendant had "demanded that the entire sentencing record be produced by live witnesses testifying in open court, basing his demand on I.C. §§ 19–2515, –2516 and the case law interpreting those statutes." 105 Idaho at 365, 670 P.2d at 466. *Cf. State v. Coutts,* 101 Idaho 110, 609 P.2d 642 (1980) and *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981) (no demand for a formal sentencing pursuant to I.C. § 19–2516).

The letter in question here was not part of a presentence report. Even if it had been, the hearsay could only have been included "where the presentence investigator believes that the information is reliable." I.C.R. 32(e)(1). Although the letter was offered and admitted at the time Mr. Arbaugh was testifying, permitting cross-examination of Mr. Arbaugh as to the statements made in the letter, this did not cure the hearsay nature of the statements. We construe I.C. § 19–2515(d) to permit the parties in a formal sentencing hearing to present all relevant evidence that would otherwise be admissible. Under *Creech* the contents of presentence investigation reports are an exception to this requirement. The State would have us also except from the requirement for live testimony under I.C. § 19–2516 "all relevant evidence" as referred to in I.C. § 19–2515(d). This interpretation would make relevant hearsay admissible in a sentencing hearing, even though it was not included in a presentence investigation report.

We note that the Idaho Rules of Evidence, except those with respect to privileges, do not apply to sentencing proceedings. I.R.E. 101(e)(3). Therefore, there is no conflict between I.C. § 19–2515(d) and these rules that would render the statute of no force or effect under I.R.E. 1102. However, if we were to allow all relevant hearsay to be admitted in formal death penalty sentencing hearings we would de-

stroy the requirement of I.C.R. 32(e)(1) that hearsay included in presentence reports be only that which the presentence investigator believes is reliable. The practice would quickly become for hearsay to be offered at the hearing rather than through the presentence report. Therefore, we hold that the letter should not have been admitted.

We are not dissuaded from our conclusion on this issue by the statement of the trial court in the written sentencing findings that he had "endeavored to avoid anything that might be hearsay, not absolutely pertinent or not totally supported by the evidence." (FINDINGS OF THE COURT IN CONSIDERING DEATH PENALTY UNDER I.C. 19–2515, p. 13) In a matter as awesome as the decision whether to impose the death penalty, a strict compliance with the procedures for sentencing is required. Even a well intentioned and conscientious effort by the trial court to avoid considering the hearsay contained in the letter does not suffice.

AS TO PART IX B(1): HUNTLEY, J., concurs.

BAKES, and BISTLINE, JJ., concur in the result.

SHEPARD, C.J., dissents.

2. *Victim impact statement.*

▇▇▇▇ Jaimi also asserts that Mr. Arbaugh's letter should not have been admitted because it was a victim impact statement (VIS), prohibited in death penalty cases by *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). We agree. We also take this opportunity to advise the trial court on resentencing to apply *Booth* to the VIS contained in the presentence report.

In *Booth* the Court held that the introduction of a VIS at the sentencing phase of a capital murder case violates the eighth amendment to the United States Constitution. The Court held invalid a Maryland statute that requires consideration of a VIS describing the effect of the crime on the victim and the victim's family. Here, the State filed a motion for the trial court to receive Mr. Arbaugh's letter into evidence pursuant to I.C. § 19–5306(1)(b) and (3). That statute provides:

(1) Upon request, each victim of a felony offense shall be:

. . . .

(b) Consulted by the presentence investigator during preparation of the presentence report and have included in that report a statement of the impact which the defendant's criminal conduct has had upon the victim;

. . . .

(3) The provisions of this section shall apply equally to the immediate families of homicide victims or immediate families of victims of such youthful age or incapacity as precludes them from exercising these rights personally.

This statute is similar to the Maryland statute considered by the Court in *Booth.*

The presentence report contains an indication that the investigator received both written and oral comments from Marilyn's parents. These comments were included in the report as a VIS. This VIS refers to the relationship between Marilyn and Jaimi, assaults on Marilyn by Jaimi on several occasions, pleas by Marilyn to Jaimi that he stay away from Marilyn and her children, statements by Marilyn to her father about threats made toward Tiffnie and Mr. Arbaugh by Jaimi, and a handwritten will by Marilyn naming her daughters as beneficiaries as a result of her expectation of the outcome of the threats by Jaimi. The report also indicates that Marilyn's mother told the presentence investigator that Tira seemed to have withdrawn into herself after Marilyn's death. Marilyn's parents are reported by the presentence investigator to have a deep fear of Jaimi and to have expressed the hope that the trial court would take measures to insure the safety of themselves and Marilyn's two daughters.

Mr. Arbaugh's letter to the trial judge was written almost five months after the presentence report was submitted. Much of the information contained in the letter had already been included in the VIS portion of the presentence report. We note that the second defense attorney moved to

strike the VIS portion of the presentence report.

In *Booth* the Court found that two types of information were included in the VIS: "First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characterizations of the crimes and the defendant." 482 U.S. at 500, 107 S.Ct. at 2533, 96 L.Ed.2d at 444. The Court found that "this information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. at 500, 107 S.Ct. at 2533, 96 L.Ed.2d at 444. The letter did not contain the first type of information described in *Booth,* but did contain the second type. The VIS portion of the presentence report contained both types of information.

While sentencing in death penalty cases in Idaho is by a judge and not by a jury, as is the case in Maryland, we do not consider this to be a distinction that makes *Booth* inapplicable to a VIS in a death penalty case in Idaho. Although we have upheld sentencing by district judges in death penalty cases, we are not prepared to interpret the eighth amendment to give judges more latitude than juries in making their decisions as to whether a defendant should be executed. The risk of arbitrary and capricious decisions exists whether the sentence is determined by a jury or a judge. Therefore, we hold that the letter should not have been considered by the trial court in the sentencing. We advise the trial court that when resentencing Jaimi, as provided below, *Booth* should also be applied to the VIS contained in the presentence report. We also declare that I.C. § 19–5306(1)(b) and (3) are unconstitutional under the eighth amendment insofar as they allow the two types of information proscribed in *Booth* to be considered in a death penalty case.

AS TO PART IX B(2): BAKES, BISTLINE and HUNTLEY, JJ., concur.

SHEPARD, C.J., dissents.

C. Findings.

1. Did the trial court improperly consider aggravating circumstances not listed in I.C. § 19–2515?

 Jaimi asserts the in its FINDINGS OF THE COURT IN CONSIDERING DEATH PENALTY UNDER I.C. 19–2515 (the Findings) the trial court improperly considered circumstances not listed in the statute. Secondarily, he asserts that he was gravely prejudiced because when the trial court considered these circumstances, he was denied notice that the trial court would predicate its sentence on these circumstances. We disagree with both of these assertions.

As an example of the findings that he argues were objectionable, Jaimi cites the portion of the Findings which states that at the time Tiffnie left the barn after finding her mother bleeding and wounded with Jaimi standing over her, "the life of Marilyn Arbaugh probably could have been saved if she had received the necessary medical attention." He argues that if he had been notified that the trial court intended to consider this circumstance, he would have contested the issue vigorously. He also contends that the consideration of these "non-statutory aggravating circumstances" violated the cruel and unusual punishment clause of the eighth amendment and permits circumstances not found beyond a reasonable doubt to enter the sentencing decision.

This Court has previously rejected all these arguments except the one based on the eighth amendment. *Creech,* 105 Idaho at 369–70, 670 P.2d at 470–71; *Sivak,* 105 Idaho at 905, 674 P.2d at 401. With regard to the eighth amendment claim, we note that the trial court concluded the Findings by stating:

This Court finds beyond a reasonable doubt that the facts establish the statutory aggravating circumstances set forth in Idaho Code Section 19–2515(G)(5) and 19–2515(G)(6). This murder was especially heinous, atrocious and cruel thereby manifesting exceptional depravity.

Further by this murder and the circumstances surrounding its commission, Jaimi Dean Charboneau exhibited utter disregard for human life.

Through this portion of the Findings the trial court made clear that its decision was not based on non-statutory aggravating circumstances. Therefore, we need not address the eighth amendment argument.

AS TO PART IX C(1): SHEPARD, C.J., BAKES, and HUNTLEY, JJ., concur.

BISTLINE, J., dissents.

2. Findings not supported by evidence.

 Jaimi asserts that there was not sufficient evidence to support a critical portion of the Findings. He challenges the following statement of the trial court:

> That after firing the first volly (sic) of shots the victim Marilyn Arbaugh was wounded but her life could have been saved if she had received necessary medical attention. At that moment the defendant, Jaimi Charboneau had a choice. He could have saved the woman he professed to love. However, with at least two minutes to give thought to the matter, the defendant, Jaimi Dean Charboneau, chose to fire additional shots into the wounded and helpless body of Marilyn Arbaugh. It appears from the facts that Jaimi Dean Charboneau acted intentionally, methodically and violently while he erased from the face of this earth the life of a human being.

Jaimi relies on the testimony of the State's pathologist to rebut the trial court's statement that Marilyn could have been saved, if she had received necessary medical attention before the final shots were fired. The pathologist testified that the cause of death was gunshot wounds of the chest that severed arteries to the heart and lungs. He stated that he had no opinion as to which of the bullets caused the fatal wounds and that it was beyond the expertise of a pathologist to give an opinion as to the order in which the wounds occurred. There is no other evidence in the record that contradicts this testimony. Therefore, we agree that there is no evidence in the

record that supports the trial court's statement.

It is unclear from the Findings whether the trial court would have imposed the death penalty without having concluded that Marilyn was not mortally wounded until the second volley of shots was fired. For that reason, together with others expressed above and below, we vacate the sentence and remand for resentencing.

AS TO PART IX C(2): BISTLINE and HUNTLEY, JJ., concur.

SHEPARD, C.J. and BAKES, J., dissent.

3. Mitigating factors.

Jaimi asserts that the trial court failed to list in the Findings all the mitigating factors that were presented. He argues particularly that the trial court failed to consider significant family information contained in the presentence report. We have compared the trial court's statement of mitigating factors with the presentence report and are unable to agree with Jaimi on this issue. All of the material mitigating information contained in the report is reflected in the Findings.

AS TO PART IX C(3): SHEPARD, C.J., BAKES, BISTLINE and HUNTLEY, JJ., concur.

4. Vagueness of I.C. § 19–2515(g)(5) and (6).

 Jaimi asserts that I.C. § 19–2515(g)(5) and (6) are unconstitutionally vague and that their use in determining Jaimi's sentence violates the eighth amendment. He argues that *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) and *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988) support his position with regard to I.C. § 19–2515(g)(5). He argues that the meaning given to I.C. § 19–2515(g)(6) in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981) was inadequate. We disagree.

In *Maynard* the Supreme Court held that the "especially heinous, atrocious, or cruel" aggravating circumstance of the Oklahoma death penalty statute was unconstitutionally vague under the eighth

amendment because it did not offer sufficient guidance to the jury in deciding whether to impose the death penalty. The decision of the Tenth Circuit Court of Appeals that was affirmed in *Maynard (Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987)) noted that the Oklahoma courts had not "adopted a limiting construction that cured the [vagueness] infirmity." 486 U.S. at 360, 108 S.Ct. at 1857, 100 L.Ed.2d at 376. In its opinion the Supreme Court also distinguished the situation in *Maynard* from that in *Proffitt v. Florida,* 428 U.S. 242, 254–56, 96 S.Ct. 2960, 2972–73, 49 L.Ed.2d 913, 925–26 (1976).

In *Osborn* this Court adopted the definition of "heinous, atrocious and cruel" of the Florida Supreme Court that was approved in *Proffitt.* This court quoted the following interpretation of the Florida court:

> "It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. *What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim."* [Citation omitted.] (Emphasis added.)

102 Idaho at 418, 631 P.2d at 200.

This Court also adopted the definition of "exceptional depravity" of the Nebraska Supreme Court in *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881, 891 (1977) *cert. den.,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158, *reh. den.,* 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1977). This Court quoted the following definition of the Nebraska court:

> "In interpreting this portion of the statute, the key word is 'exceptional.' It might be argued that every murder involves depravity. The use of the word 'exceptional,' however, confines it only to

those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence."

102 Idaho at 418, 631 P.2d at 200.

We find that these definitions remove the vagueness from I.C. § 19–2515(g)(5) that would cause us to hold the use of it to be in violation of the eighth amendment according to *Maynard.*

In *Osborn* this Court also construed the "utter disregard for human life" provision of I.C. § 19–2515(g)(6):

> [W]e hold that the phrase "utter disregard" must be viewed in reference to acts other than those set forth in I.C. §§ 19–2515(f)(2), (3), and (4) [now §§ 19–2515(g)(2), (3), and (4)]. We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer. With such an interpretation, it is our conclusion that this aggravating circumstance meets the constitutional requirements set forth by the United States Supreme Court.

102 Idaho at 419, 631 P.2d at 201.

We agree.

Our opinion as to this issue is not changed by *Adamson v. Ricketts.* In *Adamson* the Ninth Circuit held that the interpretation by the Arizona Supreme Court of the portion of Arizona's death penalty sentencing statute that is similar to I.C. § 19–2515(g)(5) was not sufficient "to provide satisfaction of *Godfrey's* [*Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)] mandate that aggravating circumstances objectively guide discretion and narrow application of the death penalty." 865 F.2d at 1033. We note that *Godfrey* cited *Proffitt v. Florida* without distinguishing its rationale or its result. 446 U.S. at 425, 100 S.Ct. at 1764, 64 L.Ed. 2d at 403. As we have indicated above, the definition of "heinous, atrocious and cruel" adopted by this Court in *Osborn* was that of the Florida Supreme Court that was approved in *Proffitt.* Therefore, we are convinced that whatever validity there may

be to the decision in *Adamson* concerning the Arizona definitions of their statutory terms, the definitions contained in *Osborn* remain constitutionally sufficient.

AS TO PART IX C(4): SHEPARD, C.J., BAKES and HUNTLEY, JJ., concur.

BISTLINE, J., dissents.

5. No duplication of aggravating circumstances.

The trial court found that the aggravating circumstances referred to in both I.C. § 19–2515(g)(5) and (6) were present in this case. Jaimi asserts that it was improper for the trial court to use both of these aggravating circumstances in determining his sentence, because they duplicate each other. Today, this Court has held that these two factors are not duplicative. *State v. Fain*, 116 Idaho 82, 774 P.2d 252. Therefore, we reject Jaimi's assertion.

AS TO PART IX C(5): SHEPARD, C.J., BAKES and HUNTLEY, JJ., concur.

BISTLINE, J., dissents.

6. Weighing mitigating circumstances against I.C. § 19–2515(g)(5) and (6) separately.

I.C. § 19–2515(c) states:

(c) Where a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the court finds at least one (1) statutory aggravating circumstance. Where the court finds a statutory aggravating circumstance the court shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make imposition of death unjust.

Jaimi asserts that this statute requires the trial court to weigh all the mitigating circumstances presented against each aggravating circumstance found, separately. He argues that if the trial court finds that all the mitigating circumstances presented outweigh any one of the aggravating circumstances found, then the sentence of death may not be imposed. He contends that this required weighing was done incorrectly by the trial court in this case. We agree that all the mitigating circumstances presented must be weighed against each of the aggravating circumstances separately. We hold that the trial court may sentence the defendant to death, only if the trial court finds that all the mitigating circumstances do not outweigh the gravity of each of the aggravating circumstances found and make imposition of death unjust.

Criminal statutes must be strictly construed. *State v. Thompson*, 101 Idaho 430, 437, 614 P.2d 970, 977 (1980). I.C. § 19–2515(c) refers to "mitigating circumstances" that are to be weighed against "any aggravating circumstance found." If the legislature had intended the mitigating circumstances to be weighed against all the aggravating circumstances found as a group, it would have referred to "the aggravating circumstances found." The plain meaning of the statute dictates our conclusion on this issue.

We are unable to accept Jaimi's argument that the statute requires the trial court not to impose the death penalty, if the mitigating circumstances outweigh any one of the aggravating circumstances found. The plain meaning of the statute is that the mitigating circumstances must outweigh "any" of the aggravating circumstances. The word "any" means "whichever one chance may select." *Webster's Third New International Dictionary*, (1969). For the mitigating circumstance in this case to outweigh "any" aggravating circumstances found, the mitigating circumstances must outweigh each of the aggravating circumstances, since chance may select either one.

In its findings the trial court quoted I.C. § 19–2515 as stating:

Where the court finds a statutory aggravating circumstance the court shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any *aggravating circumstances* found and make imposition of death unjust. (Emphasis added).

154

In making its decision as to the appropriate sentence to impose, the trial court said:

After due consideration to all the facts contained herein, the Court is unable to find any mitigating circumstances which would overcome or outweigh the *aggravating circumstances* and must therefore comply with the legislature's mandate. (Emphasis added.)

It appears to us that the trial court weighed all the mitigating circumstances against the two aggravating circumstances found, collectively rather than separately. For this reason also, we vacate the sentence and remand for resentencing in accordance with our decision.

AS TO PART IX C(6): SHEPARD, C.J., BAKES, BISTLINE and HUNTLEY, JJ., concur.

7. Presumption of death.

■■■ Jaimi asserts that I.C. § 19–2515 violates the eighth and fourteenth amendments because it places the burden on a defendant to prove the existence of mitigating circumstances that outweigh any aggravating circumstance that is found. We disagree.

I.C. § 19–2515(c) presumes that a life sentence is the sentence for first degree murder. Only if at least one of the aggravating circumstances listed in I.C. § 19–2515(g) is found to exist beyond a reasonable doubt may a sentence of death be imposed. It is only then that a defendant has the burden of coming forward with mitigating circumstances. To the extent that *Adamson* reaches a contrary result, we disagree with the Ninth Circuit.

AS TO PART IX C(7): SHEPARD, C.J., BAKES, BISTLINE and HUNTLEY, JJ., concur.

## X.

### AUTOMATIC REVIEW UNDER I.C. § 19–2827.

A. Was the sentence imposed under the influence of passion, prejudice, or any other *arbitrary factor?*

Jaimi asserts that the sentence of death in this case was arbitrary because there was no evidence to support portions of the Findings that we have reviewed above. To the extent of our holdings above that there was not sufficient evidence to support portions of the Findings, we agree. We disagree that there was arbitrariness because mitigating factors concerning Jaimi's family background were not considered. We also disagree that there was arbitrariness because this was an act of passion rather than a case involving malice aforethought. That question was submitted to the jury, and the jury found otherwise.

B. Did the evidence support the findings of a statutory aggravating circumstance under I.C. § 19–2515?

We have held above that there was no evidence in the record to support the trial court's statement that Jaimi could have saved Marilyn's life, if he had sought medical attention for her. We have also held that it was a violation of *Booth v. Maryland* and the hearsay rule for the trial court to admit and consider the letter written by Marilyn's father. Therefore, it is unnecessary for us to consider at this time whether the evidence supports a finding of either statutory aggravating circumstance under I.C. § 19–2515(g)(5) and (6). This review can be made following resentencing, if it is necessary.

C. Was the sentence excessive or disproportionate to the penalty imposed in similar cases?

In light of our decision to vacate the sentence, this review is also unnecessary.

AS TO PART X: HUNTLEY, J., concurs.

SHEPARD, C.J., concurs in result.

BAKES, J., concurs in all of Part X, except that part which incorporates the analysis of Part IX(C)(2), with which he disagrees.

BISTLINE, J., expresses no opinion.

## XI.

### CONCLUSION.

For the reasons stated above, we affirm the conviction, vacate the sentence, and remand for resentencing.

SHEPARD, Chief Justice, concurring in part and dissenting in part.

I concur in the majority opinion except parts IX B and IX C(2), and as to those portions I disagree and therefore dissent.

The majority holds that during the sentencing procedure a letter written by the father of the victim was improperly "admitted" in violation of the hearsay rule. This, although the report of the presentence investigator, is also hearsay and in fact hearsay upon hearsay. I believe the focus of the majority opinion, the hearsay rule, is inapplicable. In my view the letter, while "hearsay," was at worst only duplicative of the oral testimony of that same witness at the sentencing hearing. That oral testimony taken in open court was subject to cross-examination. Hence the admission of the letter written by the father of the victim was at most harmless error.

The testimony of that witness, both oral and written, in essence related the well justified fear of the remaining members of the family of defendant Charboneau. In my view such evidence was particularly relevant since, as indicated by the majority opinion, the defendant Charboneau had accused his stepdaughter of the killing.

I also disagree with the majority holding that *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), requires the exclusion of the Arbaugh letter, and portions of the presentence report as being a "victim impact statement." *Booth* was a jury setting death penalty case rather than a court setting death penalty case. That alone, in my view, makes *Booth* distinguishable from the instant case. Further, *Booth* was a 5–4 decision by the then membership of the then Court. In view of the vigorous dissents to *Booth* and the now changed membership of that Court, I am not persuaded that the now constituted United States Supreme Court would continue the view espoused in *Booth*.

I.C. § 19–5306 requires a sentencing court to consider the impact of the crime upon the immediate families of homicide victims. I perceive no constitutional invalidity of that statutory scheme since here we consider only Idaho's mandated court setting of the death penalty.

I disagree with the conclusion of the majority in IX C(2). In my view the majority opinion, in its recitation of the facts, supports the language of the trial court in its sentencing. The testimony of Tiffnie supports the statement of the trial court.

I would affirm the conviction and the imposition of the death penalty.

HUNTLEY, Justice, concurring and dissenting.

While I support the death penalty and concur in the bulk of the majority opinion, I respectfully suggest that Idaho's present capital sentencing procedure is unconstitutional because it removes the jury from its constitutional fact-finding role. Our process violates the federal constitution for the reasons stated in *Adamson v. Ricketts*, (Ct.App. 9th Cir., December 22, 1988) and violates the Idaho Constitution for the reasons I have articulated in *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983) and *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983). I will discuss each analysis in turn.

I.

The Jury as Fundamental to Preserving Democracy

The determination of the issue presented on appeal should be made in the context of the history and purposes of the right to trial by jury. Our forefathers wisely provided in Article 1, Section 7 of the Idaho Constitution: "The right to trial by jury shall remain inviolate ..." They so provided because they recognized that the jury system is the single most important guardian of the people's right to be protected from oppressive and overreaching government.

Few Americans realize that the right to jury trial in civil cases has almost been lost in England. English judges, with the acquiescence of a compliant bar, have totally eliminated the right to trial by jury in civil cases, except in cases of libel or slander. The English themselves seem to have for-

gotten the words of their eminent jurist, Blackstone, who wrote that trial by jury is:

> ... the glory of the English law ... [i]t is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected in his property, his liberty, or his person but by the unanimous consent of twelve of his neighbors and equals.

Blackstone Commentaries 79.

Some American judges and legislators have similarly lost touch with the following language in our Declaration of Independence:

> [George III] has combined with others to subject us to a jurisdiction foreign to our Constitution, and unacknowledged by our laws; giving his assent to their acts of pretended legislation: ... For depriving us, in many cases, of the benefits of trial by jury ...

The French philosopher and essayist, de Tocqueville, who understood and appreciated democracy in America with keener insight than any other observer of the Nineteenth Century, stated that the jury system in America:

> ... places the real direction of society in the hands of the governed ... and not in ... the government ... He who punishes the criminal ... is the real master of society. All the sovereigns who have chosen to govern by their own authority and to direct society, instead of obeying its direction, have destroyed or enfeebled the institution of the jury.

Those who believe in strict construction of our Constitution recognize that the judiciary's oath to "support and defend the Constitution" requires that we resist the temptation to enhance judicial power through encroachment into the provinces constitutionally delegated to the jury.

## II.

### The Federal Right to Jury Fact Finding in Capital Cases

In *Adamson v. Ricketts*, the 9th Circuit stated the issue:

> Adamson also contends that the Arizona statutory scheme for imposing the death penalty erroneously lists elements of the offense as factors to be determined by the sentencing judge, thus depriving him of his right to a jury decision on the elements of the crime in violation of the Sixth and Fourteenth Amendments. We agree.

The Idaho sentencing procedure under I.C. § 19–2515 is virtually identical in all material respects to the defective Arizona statutory scheme. Noteworthy is the fact that Idaho and Arizona are two of only four states which have the death penalty which have taken the jury out of the fact-finding process of making the ultimate determination as to whether the death penalty is appropriate. The fact that thirty-one of the thirty-five states which have the death penalty utilize the jury in making that determination speaks volumes as to what our Anglo–American traditions and constitutions require.

As the *Adamson* court noted:

> An aggravating "circumstance" which elevates a murder to a "death-eligible" murder in the penalty phase, remarkably mirrors the attributes of an essential element of the offense during the guilt phase of a trial. Like an element of a crime, an aggravating circumstance in the Arizona scheme informs the prosecutor what facts must be proven to obtain a conviction. The circumstance must be proven beyond a reasonable doubt. The hearing is adversarial, with oral argument and the prosecution's presentation of evidence governed by the usual rules of evidence. The presiding trial judge must make findings on the existence or nonexistence of each of the statutory aggravating and mitigating circumstances. If the judge finds an aggravating circumstance, the burden then shifts to the defendant who must put on sufficient evidence of mitigation or the death penalty will be imposed. A.R.S. § 13–703; see also *Arizona v. Rumsey*, 467 U.S. 203, 210, [104 S.Ct. 2305, 2309, 81 L.Ed.2d 164] (1984). If the prosecution is unable to prove the existence of a single aggravating circumstance, like not proving an essential element, the defendant cannot

be put to death. Cf. *Poland v. Arizona*, [476 U.S. 147] 106 S.Ct. 1749, [1754, 90 L.Ed.2d 123] (1986) (Court framed the relevant [* 39] inquiry as "whether the sentencing judge or the reviewing court has "decid[ed] that the prosecution has not proved its case for the death penalty and hence has 'acquitted' petitioners"); *Rumsey*, 467 U.S. at 212, [104 S.Ct. at 2310] (where findings of fact at sentencing hearing were all favorable to defendant, he was "acquitted" of the death penalty).

Although Idaho's majority in *Charboneau*, similarly to the judiciary in Arizona and the prosecutors in both states, urge that a trial court in finding facts as to aggravating circumstances is exercising a "sentencing determination" as distinguished from finding the elements of a death-eligible murder, their use of the language in justifying that position frequently results in Freudian slips which indicate otherwise. In fact, to rule for the state's position it is necessary to do exactly what the majority did in this case, that is, engage in a circular argument, the majority reasoning at page 146, 774 P.2d at page 316:

> To accept Jaimi's argument that the jury must be involved in determining whether aggravating circumstances exist, we would have to conclude that the aggravating circumstances listed in I.C. § 19–2515(g) are elements of first degree murder. We are unable to reach that conclusion. The circumstances listed in the statute are clearly circumstances to be considered in sentencing and not elements of first degree murder. It is not unconstitutional for a judge, instead of a jury, to determine whether any of the aggravating circumstances listed in the statute exist.

The sentence I have underscored is totally circular. Of course, if one can pronounce that the circumstances are part of sentencing and not part of the elements of a death penalty crime, then they are not elements of a death penalty crime.

The plain fact is, before a person is eligible to be executed, a *finding* must be made that the aggravating circumstance existed.

That finding is typically a jury finding, it was a jury function in Idaho from territorial days through 1977, and is a fact to be found by the jury in all but four of the states which have the death penalty.

It could of course be argued that my position is circular if I were to take the underscored sentence from the majority opinion, *supra*, and restate it as follows:

> The circumstances listed in the statute are not circumstances to be considered in sentencing but are elements of death-eligible murder.

However, I would submit that the issue is best resolved by recognizing that it is traditional and accepted jurisprudence that every factor required to prove a crime is considered an element of that crime. One cannot be sentenced to death without the finding of the aggravating circumstances having taken place and, thus, they would appear to be essential elements of the crime rather than some less important procedural matters occurring during sentencing.

The United States Supreme Court has not passed directly upon the issue presented in this case, but what it has written about the jury and its function in death penalty cases indicates that the process would be best served by bringing the four states in line at this time.

Since the Court has held that death sentences must comport with the community's sense of evolving standards of decency and its legitimate desire for moral retribution, an essential question is whether judges alone can reliably reflect the communal values that are the source of the constitutionality of capital punishment.

By definition, juries, not judges, are "the cross-section of the community," reflecting community values. *Duren v. Missouri*, 439 U.S. 357, 359, 99 S.Ct. 664, 666, 58 L.Ed.2d 579 (1979). Only a representative jury assures "meaningful community participation." *Ballew v. Georgia*, 435 U.S. 223, 235 98 S.Ct. 1029, 1036, 55 L.Ed.2d 234 (1978) (plurality opinion). Jurors, unlike judges, are selected to enhance the likelihood that they represent the whole range of community beliefs and backgrounds,

*Taylor v. Louisiana*, 419 U.S. 522, 531–33, 95 S.Ct. 692, 698–699, 42 L.Ed.2d 690 (1975); the different segments of the community bring to the representative jury "perspectives and values that influence both jury deliberation and result," *id.* at 532 n. 12 95 S.Ct. at 698 n. 12. See *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Moreover the sheer difference in size between a twelve-member jury panel and a single judge may bear significantly on the validity of a sentencing decision under the Eighth Amendment. Canvassing expert empirical studies, the United States Supreme Court has concluded that the likelihood that a decision in a criminal case correctly applies "the common sense of the community to the facts" increases with the number of decisionmakers. *Ballew v. Georgia, supra,* 435 U.S. at 232 98 S.Ct. at 1035.[1] Twelve individuals are obviously more likely to reflect the prevailing views of society than one person.[2]

A jury need not engage in questionable speculation to determine what community sentiment would say in a particular case. Its very function is to bespeak that community sentiment by exercising its own judgment. The jury's response is society's response. *Witherspoon v. Illinois,* 391 U.S. 510, 519–20, 88 S.Ct. 1770, 1775–1776, 20 L.Ed.2d 776 (1968). "The jury ... is a significant and reliable objective index of contemporary values because it is so directly involved," *Gregg v. Georgia,* (428 U.S. 153, 181, 96 S.Ct. 2909, 2928, 49 L.Ed.2d 859 (1976). By contrast, judges cannot themselves speak for community sentiment. If they are to fulfill the demands of the Eighth Amendment by bringing evolving standards of decency and principles of retribution to bear in a capital punishment case, they can do so only indirectly since "[C]ourts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits." *Dennis v. United States,* 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). Unable to represent community sentiment, a judge must undertake to ascertain it. That is necessarily a difficult task,[3] made even more difficult because judges—whether considered in terms of race, sex, or economic class—do not reflect the wide range of backgrounds or beliefs within the community.[4] "[T]he reluctance of juries in many cases to impose

1. *Ballew* also amassed considerable empirical evidence to prove that reducing the number of decisionmakers in a criminal case impairs the accuracy, fairness, thoroughness and consistency of the decision, generally to the detriment of the defendant. *Ballew v. Georgia,* 435 U.S. 223, 232–39 [98 S.Ct. 1029, 1035–38, 55 L.Ed.2d 234] (1978) (plurality opinion).

2. Significantly, every state authorizing jury involvement in capital sentencing appears to require a jury of twelve persons. *S. Gillers, Deciding Who Dies,* 129 U.Pa.L.Rev. 63, n. 298.

3. Judges may theoretically have access to community sentiment through social contact, as well as through such sources as polls, editorials, journals, and newspaper reports. Cook, *Public Opinion and Federal Judicial Policy,* 21 Am.J. Pol.Sci. 567, 576 (1977). Unfortunately, these sources greatly overstate the willingness of members of the community to impose the death penalty on specific defendants for specific crimes. Research on jury behavior reveals that jurors are substantially more lenient when trying an actual case and sitting through deliberations than they will otherwise indicate. Aeisel & Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court,* 30 Stan.L.Rev. 491, 511–12 (1978)

(shadow juries drawn randomly and not subject to peremptory challenges vote guilty far more often than real juries; probably because the defendant's liberty was not in their hands). People who favor the death penalty in the abstract are more lenient when presented with descriptions of actual cases.

4. As of 1979 judges in state courts of general trial jurisdiction earned salaries ranging from $24,000 in Oklahoma to $54,205 in California, with a mean of approximately $41,000. Nat'l Center for St. Cts., Survey of Judicial Salaries 1 (Sept. 1979). As of 1977 in these general jurisdiction courts, only 2.5 percent of the 5,155 judges were women, and 20 states had no women at all on these courts. Cook, Women Judges: *The End of Tokenism, in Women in the Courts,* 84, 87–88 (Nat'l Center for St. Cts. 1978). It appears that as of 1977 only 2.6 percent of the judges on these general trial courts were black. G.W. Crockett, Number and Distribution of Black Judges (March 1977) (unpublished charts on file with Nat'l Center for St. Cts.). Finally, the rigorous educational requirements for admission to the bar make it inevitable that the average educational attainment of judges will far exceed that of the community in general.

the sentence [of death] may well reflect the humane feeling that this most irrevocable sanction should be reserved for a small number of extreme cases," *Gregg v. Georgia, supra,* 428 U.S. at 182, 96 S.Ct. at 2929. For a variety of reasons, judges appear less likely to reflect that same reluctance.[5]

As a means of reliably reflecting community sentiment on capital punishment, bringing lay jurors into the sentencing process " 'places the real direction of society in the hands of the governed ... and not in ... the government.' " Powell, *Jury Trial of Crimes,* 23 Wash. & Lee L.Rev. 1, 5 (1966) quoting de Tocqueville, Democracy in America 282 (Reeve Tran.1948). Quintessentially, the right to a jury "is granted to criminal defendants in order to prevent oppression by the government," *Duncan v. Louisiana,* 391 U.S. 145, 155, 88 S.Ct. 1444, 1450, 20 L.Ed.2d 491 (1968), and to protect against "arbitrary action" by the compliant, biased, or eccentric judge. *Id.* at 156, 88 S.Ct. at 1451. It "reflects a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizens to one judge or to a group of judges." *Ibid.* [6] These concerns are even more compelling where life stands immediately in the balance.

---

5. Kalven and Zeisel's classic report shows that judges and juries disagree in a substantial number of cases. In a study of 3576 trials, judge and jury reached the same decision about a criminal defendant only 72 percent of the time. *H. Kalven & H. Zeisel, The American Jury,* 68 (1966). In their specific study of the death penalty, the authors report that judge and jury disagreed about the imposition of a death sentence in 19 percent of the cases, *id,* at 436. To view the results yet another way, in those cases where one or both recommended death, judge and jury disagreed 60 percent of the time. In those cases in which either the judge or jury or both would have voted for the death penalty, in 40 percent, judge and jury agreed, and in 40 percent only the judge would have voted for the death penalty, yet in only 20 percent of the cases would the jury but not the judge vote for execution. Thus, the juries were essentially twice as lenient as the judges. *Ibid.* As a United Nations Report concludes:

> "[A]mong the leading authorities in penal science, the supporters of abolition appreciably outnumber those who favour the retention of capital punishment. The specialists of the social sciences, penologists, doctors and writers on social science or criminology are, in their great majority, abolitionists. The supporters of capital punishment, apart from a number of political figures and persons holding high public office, are generally jurists with a traditional training and judges."

United Nations, Dept. of Economic and Social Affairs, Capital Punishment (ST/SOA/SD/9–10–64) (1968).

The reason for these differences may lie in the greater reluctance of judges to depart from what they perceive to be the letter of the law. See, *e.g., Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Kalven and Zeisel discovered in more than one judge "a kind of envy of the freedom of the jury to reach a decision which he as a judge could not reach" *Kalven & Zeisel, supra,* at 428. The judge's role as a strict enforcer even restricts his discretion in sentencing decisions where that discretion would seem to be wholly lawful. As one judge said of draft evasion cases: "I am opposed to conscription. I also believe that the war in Vietnam is both immoral and impractical. My sentencing policies are based upon the fact that as long as law exists, it should be imposed to effectuate its intent and purpose." Cook, *Sentencing Behavior of Federal Judges:* Draft Cases —1972, 42 Cinn.L.Rev. 597, 623 (1973). At the same time, Cook's study also reveals that as judges (unlike individual jurors) accrue experience in a given type of case, their sentencing settles into district and regular patterns of severity or leniency, *id.,* at 602–03, so that the judge's first decision whether a person lives or dies may inspire far more deliberation and consideration than subsequent decisions. For individual jurors, however, the gravity with which they approach their decisions in capital cases will rarely be affected by such routinization.

Florida studies cited in *Gillers, supra,* note 2, at 67–68 n. 318, report that sentencing judges were significantly more inclined to impose death than the juries that recommended sentences to them. The studies also show that the judges' decisions seem to correlate with the race, sex, and social background of the defendant and victim, while the juries showed no evidence of any such biases.

6. The *Proffitt* plurality's speculation that "judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury and therefore is better able to impose sentences similar to those imposed in analogous cases," *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, must, of course, be read in the context in which it was made: as a statement of the probable result of the Florida system in which an advisory jury sentence may be mitigated at the discretion of the trial judge, or increased from life imprisonment to death only where a life sentence would be manifestly unreasonable. *Id.* at 249–50, 96 S.Ct. at 2965–2966.

III.

The Idaho Constitutional Mandate

The Idaho Constitution, as first approved on July 3, 1890, and as it reads today, provides in Art. 1, § 7:

"Right to trial by jury.—The right of trial by jury shall remain inviolate...."

That right of trial by jury as it existed at the time our constitution was adopted, provided for jury participation in the capital sentencing process. Section 17 of the Criminal Practice Act of 1864 provided in pertinent part:

[A]nd the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree; but, if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly. Every person convicted of murder of the first degree, shall suffer death, and every person guilty of murder in the second degree is punishable by imprisonment in the territorial prison for a term not less than ten years, and which may be extended to life.

Section 17 was carried over verbatim into Revised Statute § 6563 (1887) enacted two years before the adoption of the Constitution.

In other words, the jury, by determining whether the party was guilty of either first or second degree murder, determined whether or not the death penalty would be imposed.

In *Blue Note Inc. v. Hopper*, 85 Idaho 152, 157, 377 P.2d 373 (1962), we stated:

The provisions of the constitution pertaining to the right to trial by jury are construed to apply as it existed at the date of the adoption of the constitution.

Moreover, empirical evidence suggests that individual state trial judges are not likely to achieve consistency among death sentences meted out across the state. *Gillers, supra*, note 2, at 58–59. Cook, *Public Opinion and Federal Judicial Policy*, 21 Am.J.Poli.Sci. 567, 623 (1977). Rather the state can better take advantage of the purported ability of judges to ensure consistency in capital

*Accord. Anderson v. Whipple*, 71 Idaho 112, 227 P.2d 351 (1951); *Christensen v. Hollingsworth*, 6 Idaho 87, 53 P. 211 (1898); *Comish v. Smith*, 97 Idaho 89, 540 P.2d 274 (1975).

Idaho continued to employ the jury in the capital sentencing process during all of the intervening years until the Supreme court of the United States struck down the death penalty statutes of most states through its 1972 decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

At the time of *Furman*, I.C. § 18–4004 read:

Punishment for murder.—Every person guilty of murder in the first degree shall suffer death or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life.

In its first post-*Furman* session (1973), the Idaho legislature deleted the jury function from I.C. § 18–4004 and made all convictions of first degree murder subject to the death penalty. This was done in an attempt to remove the "cruel and unusual punishment" aspects disapproved in *Furman*. I.C. § 18–4004 was amended by striking out the words as lined out below:

18–4004. PUNISHMENT FOR MURDER.—Every person guilty of murder in the first degree shall suffer death ~~or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted.~~ Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life.

sentencing, at no cost to the defendant's right to jury sentencing, by relying on the automatic appeal procedure by which this Court must review each death sentence in comparison to other cases involving similar crimes or defendants. I.C. § 19–2827. See, *Gregg v. Georgia*, 428 U.S., at 204–06 96 S.Ct. at 2939–2940; *id*, at 211–12, 96 S.Ct. at 2942–2943 (White, J., concurring).

The 1973 Amendment restored the law to its 1864 standing.

After the United States Supreme Court in a series of cases declared statutes of other states which were similar to Idaho's 1973 version unconstitutional, the Idaho legislature responded in 1977 with the present statutory scheme providing for inquiry into mitigating or aggravating circumstances as set forth in I.C. § 19–2515 et seq. That amendment changed the statute back to its pre–1973 language except that it omitted restoring the jury function and added the reference to I.C. § 19–2515:

> 18–4004. PUNISHMENT FOR MURDER. ~~Every~~ Subject to the provisions of 19–2515, Idaho Code, every person guilty of murder ~~in~~ of the first degree shall ~~suffer~~ be punished by death or by imprisonment for life. Every person guilty of murder ~~in~~ of the second degree is punishable by imprisonment ~~in the state prison~~ not less than ten (10) years and the imprisonment may extend to life.

Except for four states which entirely abolished capital punishment in the nineteenth century, every American jurisdiction has at least at some time employed jury sentencing in capital cases. *McGautha v. California,* 402 U.S. 183, 200 n. 11, 91 S.Ct. 1454, 1463 n. 11, 28 L.Ed.2d 711 (1971). During a period of over a century, beginning in 1838, jurisdiction after jurisdiction that retained the death penalty replaced its mandatory capital punishment law with discretionary jury sentencing, *Woodson v. North Carolina,* 428 U.S. 280, 291–92, 96 S.Ct. 2978, 2985, 49 L.Ed.2d 944 (1976) (plurality opinion). By the time of the Furman decision in 1972, Colorado was the only state in the nation to impose capital punishment without jury involvement in the sentencing process.

Despite the long history at common law and under statutory law of the states throughout this nation of involving jury in the capital sentencing process, the Idaho legislature in the present statute enacted in 1977 totally excluded the jury from its traditional function. The legislative history shows that the legislature was not even presented with a bill which provided for jury participation. The only bill presented, was one drafted by the attorney general, Senate Bill 1082, which was presented to the legislature with the following statement of purpose:

RS 1954

S 1082

STATEMENT OF PURPOSE

Only a few years ago, the United States Supreme court made new "rules" concerning the imposition of the death penalty for serious crimes. So that we conformed with this U.S. Supreme Court interpretation of the federal Constitution, the Idaho Legislature enacted in 1973 our present death penalty Section 18–4003 and 18–4004, Idaho Code.

Then, last year, the United States Supreme court again changed the rules relating to capital punishment—after many states, like Idaho, had acted in response to its previous decision. The Court, in five cases, set forth new, more definitive rules concerning sentencing where the death penalty was sought to be imposed. *The purpose of this bill is to codify into Idaho law these present requirements imposed on the states by these most recent United States Supreme Court decisions* on capital punishment so that we will conform with this latest expression of the law. (Emphasis supplied.)

The statement of purpose is misleading insofar as it suggests that the Supreme Court decisions mandated the removal of the jury from its traditional powers and functions; the United States Supreme court never at an earlier time or in this "latest expression of the law" required jury non-involvement.

Since jury participation in the capital sentencing process is part of the right to "trial by jury" as guaranteed inviolate by Art. 1, § 7 of the Idaho Constitution, I would reverse and remand for proper sentencing and would urge the legislature to amend the statutes to provide for proper jury participation in order that future capital punishment cases will not be subject to this serious defect.

## IV.

## Interim Solution by District Judges

Since this Court has not seen fit to bring the Idaho sentencing process into a constitutional posture, and since the current session of the Idaho Legislature has not even formally taken up the effect of *Adamson*, we are undoubtably going to be faced with a year or more of uncertainty while we await the review of *Adamson* by the United States Supreme Court on Certiorari. Should the 9th Circuit be affirmed, then all death sentence cases in Idaho which have been imposed in that interim period will have to be reversed and remanded for resentencing, if not a total new trial. I believe there is a method whereby our Idaho district judges, exercising their intelligence and their plenary power, can bring order to this chaos and validly complete capital cases. It has always been the law of Idaho that district judges have the power to call for advisory juries in cases where juries are not mandated by statute or common law. Our district judges could, on their own motion, adopt the procedures of the thirty-one other states by bifurcating the trial and bringing the jury in as an advisory jury at the sentencing phase. So that the jury would be fully apprised of the seriousness of its undertaking, the district judge would inform the jury that he would not impose the death penalty unless they so recommended. The district judge would, of course, retain his traditional power under Idaho law to impose a sentence less than death if he deemed such reduction appropriate. By engaging in this procedure, a district judge would not only be doing a service to the taxpayers by way of judicial economy in obviating the need for retrials or resentencing, but additionally the court would be properly serving both society and the defendant by protecting the constitutional right to trial by jury.

BISTLINE, Justice, dissenting.

## I

In this capital murder case, where the guilt of the accused would be determined by a jury, and where a guilty verdict might be of murder in the first degree, murder in the second degree, or voluntary manslaughter, defense counsel's *first* strategic tactic was to utilize the results of a SEANCE conducted by a spiritualist; from the report of this seance counsel unquestionably believed that he had received the "true facts" concerning the homicide caused by gun shot wounds. Armed with the "true facts," counsel then devoted his talents toward convincing the prosecutors that the real culprit was not defendant, but the deceased's daughter. Having wholly succumbed to relying entirely on that hypothesis, counsel not only forewent making any of the ordinary preparations for a defense, but, even more damaging to the defendant, exposed him for uncounseled interrogation by prosecuting authorities.

Generally, a person's willingness to learn life's past or future secrets from a spiritualist, fortune-teller, a seer or even a Ouija board, would be of no concern. However, if Charboneau's then counsel was rendering "effective assistance of counsel," as the majority today holds, then the sixth amendment's guarantee of right to counsel has flown the coop. As Chief Justice Shepard has written, there is no insurance that defendants will receive a perfect trial— there is only the guarantee of a fair trial. A fair trial cannot be had if a defendant is precluded from being represented by counsel who is knowledgeable and competent. Such was not the circumstance here. Worse yet, the defendant appears to have had no outside counselling or advice of any kind which would have informed him that he was being inadvertently escorted down the primrose path. The defendant could have fared no worse had he been in charge of his own case. The record makes it readily apparent that defense counsel simply was not aware that his efforts were bizarre, and, equally unaware that counsel's chosen course of conduct was extremely prejudicial to his client's constitutional right to remain silent.

This Court has properly recognized that the Idaho Constitution, where appropriate, can provide more protection than its feder-

al counterpart.[7] However, the Idaho Supreme Court cannot, through the magic wand of a judicial decree, disavow or disregard the sixth amendment protections guaranteed by the Constitution of the United States.[8] Unless and until the federal courts in *habeas corpus* or post-conviction relief proceedings hereafter intercedes, the ineffective assistance of counsel doctrine in this jurisdiction has today been rendered meaningless.[9]

## II

In addition, the majority has reacted to the well-reasoned decision of the *en banc* Ninth Circuit Court of Appeals in *Adamson v. Ricketts*, 865 F.2d 1011 (filed December 22, 1988), by rejecting it even before there has been any review by the Supreme Court of the United States. In that manner, Charboneau and other capital defendants similarly situated are deprived of the fundamental right to jury sentencing guaranteed by both art. 1, § 7 to the Idaho Constitution and the sixth amendment to the Constitution of the United States. These concerns will be addressed in turn.

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Initially, the majority sets the stage for this aberration by failing to understand and utilize the proper standard of review. Under the seminal case of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a criminal defendant must establish: (a) counsel's deficient performance, and (b) prejudice. With this much the majority is in accord. However, under the prejudice prong, it does *not* have to be shown that without counsel's error the defendant would have otherwise earned an acquittal. The heavy burden of such an outcome-determinative test was specifically rejected by the Supreme Court in *Strickland.* Although such a standard is appropriate for assessing a motion for a new trial based on newly discovered evidence, in regard to ineffective assistance of counsel claims, the defendant need only establish "... that there is a *reasonable probability* that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability *sufficient to undermine confidence in the outcome.*" 104 S.Ct. at 2068 (emphasis added).

Thus, the majority rejects *Strickland's* mandate and affixes to Charboneau the burden of proving the result of the trial would have been different absent the replete errors of commission and omission attributable to defense counsel, specifically placing all reliance on the results of the seance and at the same time making not even a cursory attempt at preparation for an extremely crucial trial.[10]

Not only does the majority fail to comprehend the proper standard for evaluating ineffective assistance of counsel claims, it also shows little regard for the record. Without question, counsel Bennett relied upon the results provided from a seance in charting the course for his representation of Charboneau. The prosecutor who originally handled this case for Jerome County

---

**7.** *See State v. Henderson,* 114 Idaho 293, 756 P.2d 1057 (1988) (Idaho Constitution prohibits use of roadblocks designed to apprehend drunk drivers absent warrant or probable cause); *State v. Thompson,* 114 Idaho 746, 760 P.2d 1162 (1988) (Idaho Constitution prohibits use of pen registers on citizens' telephones absent warrant or probable cause).

**8.** Article 1, § 3 of the Idaho Constitution provides: "The state of Idaho is an inseparable part of the American Union, and the Constitution of the United States is the supreme law of the land."

**9.** I concur in Parts III, IV, V, IX(B)(1) (with explanation), IX(B)(2), IX(C)(2), IX(C)(3),

IX(C)(6), IX(C)(7) and dissent to Parts I, II, VI, IX(A), IX(C)(1), IX(C)(4) and IX(C)(5). I express no opinion as to Parts VII, VIII, X and XI, because a proper resolution of this case would render those issues entirely moot.

**10.** The majority opinion states: "It is Charboneau's burden to prove that the *result would have been different,* if he had not testified at the hearing on the motion to dismiss." At 138, 774 P.2d at 308 (emphasis added). Such a burden is unrealistic. Absent a retrial, that theorem is unsusceptible of proof. The fact is that defense counsel did make the decision to have Charboneau testify.

testified to his knowledge that Bennett contacted his niece in California, a clairvoyant, that through a seance the niece was able to "contact" the victim, Marilyn Arbaugh, that the spirit of Marilyn stated that her murderer was not Charboneau, but her daughter Tiffnie, and that the fatal shot was from a different gun not belonging to Charboneau. The prosecutor's testimony:

Q. Will you, please, state your full name for the record.

A. Dannis M. Adamson.

Q. And where do you live?

A. I live seven north, three east of Jerome.

Q. Okay. And your occupation, please?

A. I'm an attorney.

Q. How long have you been an attorney?

A. Since 1979.

Q. All right. I understand you were prosecuting attorney here in Jerome for a while; is that correct?

A. That's correct. For the last part of '82 and all of '83 and '84.

Q. Okay. Dan, are you familiar with the Jaime Charboneau case?

A. I certainly am.

Q. And how is it that you're familiar with that case?

A. I was the prosecuting attorney for Jerome County representing the State of Idaho in State of Idaho versus Jaime Charboneau; three, three different counts: Grand theft, rape, and first-degree murder.

Q. Okay. And I understand that the Attorney General's office was appointed to prosecute that action sometime during the proceedings; is that right?

A. Okay. It became obvious that the trial was not going to take place before I left office because I did not rerun for the prosecutor's position; and when that decision was made, that's when the Attorney General's office came in, yes.

Q. All right. Dan, did you ever have any private conversations with Golden Bennett concerning this case?

A. Yes.

Q. Okay. And when did you have these particular conversations?

A. Well, we had various conversations ranging from, from when he was first appointed; but I talked with him regularly before the preliminary hearing, before Mr. Charboneau was bound over to District Court, conversations on a regular basis.

....

Q. Dan, you said there was one particular theory that he elicited to you in a conversation. Where did it take place?

A. Well, again bits and pieces, even in the hallway, but primarily I think in my office and, the prosecutor's office.

Q. Who was present during that particular conversation?

A. Well, I'm almost certain [defense investigator] Mr. Coakley was and Golden Bennett and myself.

Q. Okay. Could you relate to the court what the substance of that conversation was?

A. Well, basically, it was: You've got to bring in the .22 revolver pistol. You have to change the focus of your investigation and take the heat off of my client and place it on Tiffy, Tiffnie Arbaugh, because she's the one that shot the, made the final shot into her mother.

And my question was, well, how do you know all this? And frankly, I expected him to say that his client told him so, and in fact in some of the earlier suggestions as to how this crime had happened, he had gotten those from Mr. Charboneau. But this particular instance dealt with the fact that he had contacted his niece or cousin or something like that in California, that she conducted a seance and that she had communicated with Marilyn Arbaugh, the victim in the case, and that Marilyn had indicated how much she loved Jaime Charboneau, and that even though she was upset that her daughter had shot the final shot, she also forgave her because she knew how much she had hurt her, et cetera, et cetera, et cetera. And it was kind of a long drawn-out statement as to what this dead person had said through the seance, trying to convey her love to

Jaime Charboneau, and forgiving of her daughter for shooting her.

Tr., Vol. 23, Post-conviction Relief Hearing, 57–62.

Mr. Bennett's secretary also testified. She stated that much of the pre-trial defense was concentrated on summoning assistance from the world of the supernatural. Her testimony on post-conviction proceedings was corroborative of the prosecutors.

Q. Okay. Are you familiar with a Jaime Charboneau case?

A. Yes.

Q. How is it that you're familiar with that?

A. Well, I worked for Golden for about four months in '84 and the first part of '85 when he was defending Jaime.

Q. Okay. Golden was representing Jaime during this entire time; is that correct?

A. Yes.

Q. Did you ever witness any conversations between Golden Bennett and his investigator James Coakley?

A. Yes.

Q. Okay. And where were these conversations? Where did they take place?

A. In Golden's office.

Q. All right. And who was present at the time?

A. Golden, Jim Coakley, Golden's daughter-in-law Jean, myself, Peggy, I can't tell you who was there every, you know, for every conversation, but people that work in the office.

Q. Okay. When did these conversations take place?

A. Well, they'd—the whole time that I was working there on several occasions.

Q. Were they frequent, all the time? Were they now and then? What were they?

A. They were frequent. That was the case that, Golden's big case he was working on when I was there. They talked about it a lot.

Q. Okay. And would you relate to the Court the substance of these conversations?

A. Well, they were planning their strategy, what, how they were going to try to help Jaime with the information that Jim Coakley was furnishing Golden.

Q. And what was that?

A. Well, he was trying to contact the deceased's spirit on several occasions. He said that it was an unfriendly spirit. And then one day we came to work and he said that he'd contacted her the night before and as far as I know that's what Golden was basing his information on.

Q. Okay. Did they talk about clairvoyants during this period of time?

A. Yes.

Q. Often?

A. Yes.

Q. Okay. And did you hear Golden Bennett talk about clairvoyants?

A. Yes. Not as much as Jim did, but, yes.

Tr., Vol. 23, Post-conviction Relief Hearing, 163–65.

Defense counsel was preoccupied with using the results of a seance in preference to utilizing the traditional measures relied upon by defense lawyers: fact investigation coupled with legal research. Moreover, rather than independent investigation of the circumstances of the case, defense counsel approached the Attorney General's office in an attempt to persuade the State to investigate. As defense counsel explained in his deposition:

My purpose in going to Boise was to convince the attorney general's office that an independent investigation was needed, and that it wouldn't be done properly in Jerome County, *and I had complete faith in the attorney general's office, I still do*, and it just seemed like the appropriate way to go at the time.

Deposition of Golden Bennett at 27 (emphasis added). *Thus, instead of accepting the responsibility of embarking on his own factual investigation, defense counsel relied upon the prosecutorial arm of the State to do it for him.* The lack of investigation and preparation for trial is also shown by the testimony of Randy Stoker, the attorney who ultimately, and on short notice, represented Charboneau at trial:

I picked up that case in a posture *where there had been virtually no investigation done,* there were no readable, credible witness statements in the file. *There were no jury instructions prepared.* Jaimi had never been examined by a psychiatrist or psychologist. *There was no ballistics experts hired. There were no pathological testimony from a defense standpoint.* There was nothing in terms of what I would consider assistance to me at that point in the file that I was handed from his previous counsel.

Vol. II, Post-conviction Relief Hearing at 27 (emphasis added).

The American Bar Association's "Defense Function" upon which the majority heavily relies, provides that:

> It is the duty of the lawyer to conduct prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. *The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.* The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

Standard 4–4.1 (1982) (emphasis added). While the standard makes clear that the defense attorney should try to secure information and evidence through discovery, an *independent* investigation is also required. *Otherwise, if it be true that the prosecution can properly be relied upon to do all of the investigative tasks for an accused, the adversarial nature of our criminal system of justice breaks down.* As observed in *Strickland,* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the *adversarial process* that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064 (emphasis added).

In *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), the Supreme Court was asked whether a defense counsel's failure to file a timely suppression motion, due to a lack of investigation, constitutes ineffective assistance of counsel. The Court held that it did:

> The justifications Morrison's attorney offered for his omission betray a startling ignorance of the law—or a weak attempt to shift blame for inadequate preparation. [C]ounsel has · a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' [citations] Respondent's lawyer neither investigated, nor made a reasonable decision to investigate, the State's case through discovery. Such a complete lack of pretrial preparation puts at risk both the defendant's right to an ' "ample opportunity to meet the case of the prosecution," ' [citations] and the *reliability of the adversarial testing process.*

106 S.Ct. at 2588–89 (citations omitted) (emphasis added).

Defense counsel not only failed to investigate, but he also subjected his client to examination by the State for no legally recognizable purpose. Moreover, at defense counsel's invitation the State was allowed to interrogate Charboneau for two hours, without defense counsel being present. The scope of the questioning was not limited and Charboneau was left to fend for himself. The majority readily and properly concedes that "Charboneau divulged a great many more particulars concerning the alleged kidnapping, theft and murder." At 135, 774 P.2d at 305.

Defense counsel also called Charboneau to the stand to testify at the preliminary hearing, thereby waiving the constitutional right to remain silent. The majority says of this strange affair, "[w]hile it may not have been the game plan that other attorneys would have followed, we may not second guess counsel's strategic and tactical choices." At 138, 774 P.2d at 308. The majority is only half right in stating that premise. True, unsuccessful but reasonable tactical decisions should not be the basis for finding ineffective assistance of counsel, but only so long as the strategic

choices have some *plausible basis in the record.* As this Court's opinion in *Aragon v. State (Aragon II),* 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988) stated: "When counsel's trial strategy decisions are made upon the basis of inadequate preparation, ignorance of the applicable law, or other shortcomings capable of *objective* evaluation, the defendant may very well have been denied effective assistance of counsel" (quoting *State v. Tucker,* 97 Idaho 4, 10, 539 P.2d 556, 562 (1975) (emphasis added in *Aragon* II)).

This case stands in stark contrast to *Aragon II,* where the ineffective assistance contention lay in failing to call witnesses to bolster the accused's character. The decision not to call character witnesses was reasonable, so it was held, because counsel, associate counsel and an investigator had interviewed Aragon's family and people that knew him; thereafter, *counsel made the informed decision* that the defense would not be helped by calling such persons. 114 P.2d at 763, 760 P.2d at 1179. Unlike *Aragon II,* however, *defense counsel in the instant case engaged in no independent factual investigation* upon which to base principled strategic decisions.

The majority concludes that defense counsel's performance was effective because nothing contained in the American Bar Association's standards prohibits counsel from placing the accused on the stand as a witness at the preliminary hearing. However, as the High Court made clear in *Strickland:*

> Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.,* ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ('The Defense Function'), are guides to determining what is reasonable, *but they are only guides.* No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

104 S.Ct. at 2065 (emphasis added). Indeed, a case may arise where it is in the defendant's interest to testify at the preliminary hearing. However, in the case at bar no reason for calling Charboneau to testify has surfaced, other than as it might somehow induce the Attorney General to investigate the case with the thought in mind that the murderer was not Charboneau.

Subjecting the unrepresented defendant to the State's questioning on two occasions was not enough. Defense counsel also put Charboneau on the stand when the Motion to Dismiss was heard. Defense counsel, however, was certain that the Motion to Dismiss would not be granted. His purpose was only to embarrass the prosecution into conducting a more thorough investigation along the aforesaid avenues. However, anything Charboneau might say in such circumstance later could then be used to impeach him at trial if he were to testify. One expert witness, practicing attorney and formerly a judge, Lloyd Webb, stated that defense counsel's decision to place Charboneau on the stand in order to embarrass the prosecution was: *"Nonsense. You don't embarrass prosecutors into making proper investigations that way. This is not a judgment call. This is just plain incompetency. I can't understand Mr. Bennett and why he did that."* Vol. I, Post-conviction Hearing at 56 (emphasis added).

Thus, Charboneau was denied effective assistance by the defense counsel's: (a) placing unbridled reliance on the report given to him as to the results of the seance in formulating the "defense" which he conducted; (b) failure to investigate the facts of the case, proceed with discovery, and generally make the necessary preparations for trial—as against merely relying on the prosecution to investigate the case along the lines defense counsel outlined, thereby undermining the adversarial nature of the criminal justice system; and (c) allowing the state the unfettered opportunity to interrogate Charboneau without counsel being present; and (d) calling Charboneau as a witness at the preliminary hearing and hearing on the motion to dismiss absent any plausible basis for so doing.

## B. FAILURE TO STRIKE EVIDENCE OF GRAND THEFT AND KIDNAPPING CHARGES

The majority holds that evidence of the felony charges of kidnapping and grand theft was properly not stricken, even though both charges were dismissed at the close of the prosecution's case for lack of jurisdiction. It is said that such evidence shows Charboneau's motive or intent under I.R.E. 404(b). The majority opinion supplies the trial court's reasoning for not granting the motion: "The court denied the motion on the ground that the evidence would have been admissible in the murder case in any event." Majority Op., p. 135, 774 P.2d p. 305. On page 143, 774 P.2d page 313 of the Majority Opinion is added to the foregoing this sentence: "This thing occurred over a period of some ten or twelve days and I think the jury needs the benefit of all that testimony in order to properly arrive at a decision, whichever way they decide."

The majority then disposes of this extremely crucial evidence by recounting the facts of an earlier (1979) case which—wholly unlike this case—was in large part based on circumstantial evidence. A burned torso, minus head and legs, was discovered, and authorities made a tentative identification that the corpse was the remains of one Ron Needs. This led to the arrest of Sally Needs, and thereafter a trial on a charge of murder. The prosecution proved the identity of the corpse to the satisfaction of the jury by circumstantial evidence.

Sally Needs was convicted based on the testimony of a witness who in mid-June saw Sally Needs arm herself with two butcher knives, and brandish them at Ron Needs, who disarmed her. The witness testified that Mrs. Needs threatened that she was going to get him—also then throwing gasoline on him. On appeal Sally Needs contended that the trial court erred in allowing in the testimony of the assault, which was established as having been two weeks prior to Ron Need's death. This Court held that it was not error to allow the testimony, the rationale being that "[s]uch evidence is clearly relevant to her motive and intent as well as to shed consid-

erable light on her mental attitude towards Ron Needs." 99 Idaho 883, 893, 591 P.2d 130, 140 (1979). Although that language is somewhat overbroad, it met with my approval then, and continues to. That was an unusual set of circumstances.

Here we have a homicide which took place with witnesses in the area. What I remember best in the *Needs* case is the statement that "Idaho courts do follow the general rule *that evidence of other unrelated criminal activity is inadmissible at trial to show criminal propensity on the part of the accused.*" 99 Idaho 883, 892, 591 P.2d 130, 139 (1979) (emphasis added).

Here, the two charges of kidnapping and a grand theft, neither related to the homicide, were both alleged to have taken place when Charboneau on June 21, 1984, entered his former wife's car and drove off with her and the car allegedly keeping her captive until she escaped. The car was alleged to be valued at over $150.00.

Those two unrelated charges were *not* filed in connection with the July 1 homicide charge which was later filed on July 2, 1984. It was defense counsel who conceived that strategic "tactic" of promoting a single trial of all three charges. As pointed out in Mr. Fuller's opening brief in this Court, the district court attempted to dissuade defense counsel from such foolishness:

> [T]he Court acknowledged that it was improper to consolidate the three criminal trials and that Jaimi was going to be prejudiced. He stated:
>> And I might further add, if Mr. Charboneau will recall, I did my level best and *even fought with counsel to separate these trials.* I didn't want them all held together; I wanted to separate the one from the other. And Mr. Charboneau and counsel wanted it held together. So that's one of the problems we run into by holding it together. Objection overruled.

Trial Tr., Vol. II, p. 375, L. 4–11 (emphasis added).

Upon the State resting its case, Mr. Stoker moved to dismiss the kidnapping

and grand theft charges on jurisdictional grounds that had been discussed early in the trial with the trial court judge. Both charges were dismissed because jurisdiction was wholly lacking. Then Mr. Stoker attempted to strike the evidence concerning the issues involved in the grand theft and kidnapping counts that he had tried to exclude earlier. In response to Mr. Stoker's Motion to Strike, the Court stated:

> There is no evidence whatsoever that all or any part of the crime occurred in Jerome County, and that would—jury would have to speculate as to that, it would be pure speculation. That's why I'm taking it away from them … I am concerned about the defense' motion to instruct the jury. (Motion to Strike) I think that I would have to so instruct them, because—and here is another part—*this is the thing that bothered me about this case a long time ago, is when the defense was always wanting to join all of these cases for trial.* I turned down that Motion I don't know on how many occasions. Finally, at the last session when you were together where the state joined and the defense joined, I allowed it to go through. *It bothers me that the jury does have in their minds all of the other evidence … and I don't know if I can cure that with an instruction.*

Trial Tr., Vol 6, p. 1361, LL. 20–25, p. 1352, LL. 1–15.

. . . .

When one considers all of the facts, the bottom line is that the defendant was prejudiced and could have received a verdict other than first degree murder. In fact, there was an extremely good possibility that the defendant could have been convicted of voluntary manslaughter.

Appellant's Brief at 247–50 (emphasis added).

## C. JURY DETERMINATION OF LIFE OR DEATH

The majority continues to repudiate the mandate of art. 1, § 7 of the Idaho Constitution, thereby robbing the capital defendant of the right to a jury trial. The life or death decision had always been within the exclusive province of the jury in Idaho, until the legislature in 1977 passed the current version of I.C. § 18–4004, drafted and sponsored by the Attorney General. The steady stream of dissents from Justice Huntley and later myself beginning with *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), have failed to persuade a majority of this Court, or the legislature, that the Idaho Constitution requires jury participation in capital sentencing.

Today the majority takes on bigger game and now rejects the sound reasoning of the *en banc* Ninth Circuit Court of Appeals in *Adamson v. Ricketts*, 865 F.2d 1011 (1988), holding that the Arizona capital sentencing scheme—remarkably similar to Idaho's—violates the sixth amendment right to a jury determination of each element of the offense charged.

> In *Adamson* the Ninth Circuit stated:
> Under Arizona's revised code, all murder is not capital murder. Since 1973, Arizona has required that *before a death sentence may be imposed* the trial judge must find beyond a reasonable doubt that at least one statutory aggravating circumstance exists. While Arizona has formally subdivided murder into at least four categories—first degree murder, second degree murder, manslaughter and negligent homicide—it appears that aggravating circumstances in fact operate to create an additional category of murder. While the statute's nomenclature ('aggravating circumstances') suggests they are mere factors guiding the judge in his or her determination of the appropriate penalty, all other indicators confirm that aggravating circumstances are additional *elements* necessary for a finding that a defendant is guilty of the distinctive offense of *capital* murder. Finding aggravating circumstances results in the only crime in Arizona for which a defendant may receive a death sentence.

865 F.2d at 1011 (1988) (emphasis and parentheses in original; footnotes omitted).

Like Arizona's aggravating circumstances, Idaho's capital sentencing statute, I.C. § 19–2515, constitutes elements of the crime of capital murder. Simply put, an Idaho citizen cannot be put to death unless the evidence establishes an aggravating circumstance, the *sine qua non* of capital murder. Accordingly, when the presence of such an element is determined by a trial judge—and not a jury—the right to a jury trial guaranteed by the Idaho and federal constitutions is violated.

A majority of the Court, however, shuns *Adamson* on the basis of the Supreme Court's decision in *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), which held that judge-sentencing in capital cases does not violate the eighth amendment prohibition against cruel and unusual punishment. However, in *Adamson* the Ninth Circuit convincingly demonstrates that the

> [Supreme] Court's examination in *Spaziano* was limited to the constitutionality of judicial 'sentencing' and evaluation of 'the appropriate punishment to be imposed.' 468 U.S. at 458–59, 104 S.Ct. at 3161–62. *The Court never addressed a claim of judicial fact-finding as to an element of the offense. Thus the Court never reached the particular contention Adamson raised:* that Arizona's capital sentencing statute requires the judge to determine elements of the offense charged, thereby taking this factual element out of the jury's hands in violation of the Sixth Amendment. Sentencing, or the ultimate determination of an appropriate penalty, involves the *weighing* of factors. Such weighing is completely distinct from threshold findings of whether requisite elements even exist from which the trier-of-fact draws conclusions of guilt or innocence.
> *Thus, Spaziano is not controlling in this case, as it left untouched the question of the right to a jury trial* where the aggravating circumstances of a state's death penalty statute are elements of a capital offense.

865 F.2d 1011 (footnote omitted) (emphasis added). The ultimate outcome is, of course, up to the Supreme Court of the United States, but whatever it may be, that Court surely will address the issue as one of first impression, and not "inherently" mandated by *Spaziano* as the majority of this Court today erroneously concludes.

## D. THE HEARSAY LETTER FROM THE VICTIM'S FATHER

The majority holds that the letter written by the victim's father and admitted at the penalty phase of the trial was inadmissible hearsay. With that much I agree. However, a majority of this Court adheres to the view that hearsay contained in a presentence investigation report can properly be considered by a trial judge when weighing aggravating against mitigating circumstances.

Idaho Code § 19–2516 provides:

> Inquiry into circumstances—Examination of witnesses.—The circumstances *must be presented by the testimony of witnesses examined in open court,* except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section.

(Emphasis added.) I remain convinced that the mandate of the legislature expressed in I.C. § 19–2516 and that of the founding fathers expressed in the due process clauses of the state and federal constitutions prohibits the admission of presentence investigation reports obtained by hearsay and containing hearsay. As stated on an earlier occasion:

> [T]he Court simply cannot in any show of conscience continue to let capital sentencing be hinged on unsworn statements and other forms of hearsay. It is now clear that a capital case involves two trials. The first is to try the issue of the accused's guilt. If convicted, the second is to try the issue of the circumstances of

his crime and the facets of his character. Common sense dictates that the second trial for his life is the defendant's more important trial. Can it be then that in Idaho we have a rule that while due process obtains at the guilt trial, anything goes at the second trial which determines the issue of life and death? Until recently, I had thought that removing the element of due process from the second trial was such a monstrous proposition as to be undeserving of discussion or comment.

*State v. Sivak*, 105 Idaho 900, 920–21, 674 P.2d 396, 416–17 (1983) (Bistline, J., dissenting).

It seems exceptionally clear to me that unless the system has broken down to the point where it is permissible to allow a jury—as the sentencing authority—to have placed before it anything and everything which a presentence investigator comes across or can stir up, then, and only then, should a district judge as sentencing authority likewise be so influenced.

### E. VAGUENESS OF AGGRAVATING CIRCUMSTANCES

The cruel and unusual punishment prohibitions of the state and federal constitutions require that the sentencer's discretion in imposing the death penalty limited to "minimiz[e] the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Supreme Court has held that the statutory aggravating circumstances, such as those in I.C. § 19–2515, must be given a limiting construction if the state is to meet its constitutional obligation "to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980).

Idaho Code § 19–2515(g) provides:

The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reason-

able doubt before a sentence of death can be imposed.

. . . .

(5) The murder was *especially heinous, atrocious or cruel, manifesting exceptional depravity.*

(6) By the murder or circumstances surrounding its commission, the defendant *exhibited utter disregard for human life.*

(Emphasis added.) In regard to the (g)(5) aggravating circumstance, the majority concludes that the following limiting construction passes constitutional muster:

It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. *What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.*

At 152, 774 P.2d at 322 (quoting *State v. Osborn*, 102 Idaho 405, 418, 631 P.2d 187, 200 (1981) (emphasis in original).[11]

The limiting construction given to the (g)(5) aggravating circumstance by *Osborn* and reaffirmed today by the majority, is wholly insufficient to guide the sentencer's discretion in limiting the application of the death penalty consistent with constitutional mandates. Terms beget terms. What is the *"norm"* of capital felonies? Who sets this "norm"? Indeed, *all* first degree murders involve the unlawful killing of another with malice aforethought. What sets this particular murder apart—not from other crimes—but from the "norm" of *first degree murder?* In a domestic dispute husband kills wife with a gun. Do all such

---

**11.** The *Osborn* majority adopted this limiting construction to a very similar aggravating circumstance of the Florida Supreme Court in

*State v. Dixon*, 283 So.2d 1 (Fla.1973), *cert. den.*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).

murders now warrant execution? If so, it can hardly be said discretion is limited.[12]

Also, the *Osborn* "limiting" definition of the (g)(5) circumstance provides that the murder must be "unnecessarily *torturous* to the victim." Clearly, however, this definition is simply duplicative of the (g)(7) circumstance which subjects defendants to death for murder by torture.[13] In the final analysis, *all* first degree murders are "especially heinous, atrocious or cruel, manifesting exceptional depravity." Nothing in the majority's interpretation restricts the broad brush with which the subsection is drawn.

The (g)(6) aggravating circumstance, which requires that the defendant exhibit "utter disregard for human life," suffers from similar infirmities. Today the majority reaffirms the "limiting" construction enunciated in *Osborn:*

> We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the *utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer.*

At 152, 774 P.2d at 322 (emphasis added) (quoting *Osborn*, 102 Idaho at 419, 631 P.2d at 201). What first degree murderer fails to show "callous disregard for human life"? I suppose this would be the "pitiful" slayer, who, prior to delivering the fatal blow, tells the victim: "Excuse me, pardon me, I know it's inconvenient, but I must now take your life."

Furthermore, the (g)(5) and (6) aggravating circumstances are duplicative. *Every* murderer who exhibits "utter disregard for human life" commits a crime which is "especially heinous, atrocious or cruel manifesting exceptional depravity." Today, however, the majority in *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989), concludes that the aggravating factors describe two

"quite *different* kinds of culpability." The majority states:

> The particularly cold-blooded killer *need not* act sadistically or in a particularly *outrageous fashion* in order to commit a killing with *utter disregard for human life*. One who commits a crime in an especially heinous way is punished for the heinousness of his crime, not because he acted with utter disregard for human life, although it may be expected that most especially heinous, atrocious or cruel murders will have been committed with utter disregard for human life.

*Fain*, 116 Idaho at 99, 774 P.2d at 269 (emphasis added).

Thus, according to the majority, a "cold-blooded killer *need not* " act in an "outrageous fashion" to commit a murder "with utter disregard for human life." I cannot fathom a first degree murder which is not carried out in an "outrageous fashion." Every premeditated murder is outrageous.

The (g)(5) and (6) subsections are nothing more than kitchen sink aggravating circumstances which enable the state to make *every* first degree murderer not just a candidate for, but an actual recipient of, the harshest and most final of all criminal penalties. As a result, the mandate to narrow the class of death-eligible murders is abandoned.

---

12. The *Adamson* court, reviewing Arizona cases applying similar "heinous and/or depraved" language *convincingly demonstrated* that the words themselves are empty vessels capable of being filled by a court as it chooses with *any facts* at hand. *Adamson*, 865 F.2d at 1031.

13. Idaho Code § 19–2515(g)(7) provides: "The murder was one defined as murder of the first degree by section 18–4003, Idaho Code, subsections (b)(c)(d)(e) or (f), and it was accompanied with the specific intent to cause the death of a human being." Idaho Code § 18–4003(a) is the murder by torture statute.